**Slip Op. 08-141**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| NUCOR CORP. and STEEL DYNAMICS, INC., | |
| Plaintiffs, | |
| and | |
| THYSSENKRUPP STEEL AG, THYSSENKRUPP STEEL N.A., INC. and SALZGITTER AG STAHL UND TECHNOLOGIE, | |
| Consolidated Plaintiffs, | **BEFORE: GREGORY W. CARMAN, JUDGE** |
| and | |
| AK STEEL CORP. and UNITED STATES STEEL CORP., | Consol. Court No. 07-00071 |
| Plaintiff-Intervenors, | **Public Version** |
| v. | |
| UNITED STATES, | |
| Defendants, | |
| and | |
| JFE STEEL CORP.; KOBE STEEL, LTD.; NIPPON STEEL CORP.; NISSHIN STEEL CO., LTD.; SUMITOMO METAL INDUS., LTD.; BLUESCOPE STEEL AMERICAS LLC; BLUESCOPE STEEL LTD.; ARCELORMITTAL USA INC.; and ARCELORMITTAL DOFASCO INC., | |
| Defendant-Intervenors. | |

[*Held: Plaintiffs' motions for judgment on the agency record are DENIED; U.S. International Trade Commission's Five Year Sunset Determination is AFFIRMED.*]

Wiley Rein LLP, (Alan H. Price; Timothy C. Brightbill; Robert DeFrancesco) for Plaintiff, Nucor Corporation and Steel Dynamics, Inc.

King & Spalding LLP, (Joseph W. Dorn; Elizabeth E. Duall; Jeffrey M. Telep) for Plaintiff-Intervenor AK Steel Corporation.

Skadden, Arps, Slate, Meagher & Flom LLP (Stephen J. Narkin; Robert E. Lighthizer; John J. Mangan; James C. Hecht; Stephen P. Vaughn) for Plaintiff-Intervenor United States Steel Corporation.

Sharretts, Paley, Carter & Blauvelt, PC, (Gail T. Cumins; Beatrice A. Brickell; Donna L. Shira) for Consolidated Plaintiffs ThyssenKrupp Steel AG, ThyssenKrupp Steel N.A., Inc. and Salzgitter AG Stahl und Technologie.

James M. Lyons, General Counsel; Neal J. Reynolds, Assistant General Counsel, Office of the General Counsel, United States International Trade Commission (June B. Brown; Andrea C. Casson; David B. Fishberg), for Defendant, United States.

Gibson, Dunn & Crutcher, LLP (Daniel J. Plaine; J. Christopher Wood; Gracia M. Berg; Dave M. Wharwood) for Defendant-Intervenors JFE Steel Corporation, Kobe Steel, Ltd., Nippon Steel Corporation, Nisshin Steel Co., Ltd., and Sumitomo Metal Industries, Ltd.

Leonard M. Shambon, Esq. (Leonard M. Shambon) and Fischer Fox Global PLLC (Lynn M. Fischer Fox, Esq.; Gracia M. Berg, Esq.) for Defendant-Intervenors BlueScope Steel Americas LLC and BlueScope Steel Limited.

Stewart and Stewart (Terrence P. Stewart; Patrick J. McDonough; Elizabeth A. Argenti) for Defendant-Intervenor ArcelorMittal USA Inc.

Hunton & Williams LLP (William Silverman; Douglas J. Heffner; Richard P. Ferrin) for Defendant-Intervenor ArcelorMittal Dofasco Inc.

Hogan & Hartson, LLP (Mark S. McConnell; Jonathan T. Stoel; Lewis E. Leibowitz) for Chrysler LLC, Ford Motor Company, General Motors Corporation, Honda of America Mfg., Inc., Honda Trading America Corporation, Mercedes-Benz U.S. International, Inc., Nissan North America, Inc., and Toyota Motor North America, Inc. Amici Curiae.

**OPINION & ORDER**

Dated: December 23, 2008

**CARMAN, JUDGE:** This consolidated matter is before the Court on several motions for

judgment upon the agency record brought by plaintiffs/plaintiff-intervenors Nucor

Corporation ("Nucor"), Steel Dynamics, Inc. ("SDI"), AK Steel Corporation ("AK Steel")

(together the "Joint Plaintiffs"), and United States Steel Corporation ("USS"), along with

consolidated plaintiffs ThyssenKrupp Steel, AG, ThyssenKrupp N.A., Inc., and

Salzgitter AG Stahl und Technologie (together the "German Plaintiffs") pursuant to U.S.

CIT Rule 56.2.

Joint Plaintiffs, USS, and German Plaintiffs respectively challenge particular

aspects of the final determination by the United States International Trade Commission

("ITC" or "Commission") in certain five-year sunset reviews pursuant to 19 U.S.C.

§§ 1675(c), 1675a(a) (2000) concerning corrosion-resistant carbon steel products from

Australia, Canada, France, Germany, Japan, and Korea.  JFE Steel Corporation, Kobe

Steel, Ltd., Nippon Steel Corporation, Nisshin Steel Co., Ltd., Sumitomo Metal

Industries, Ltd., BlueScope Steel Limited, BlueScope Steel Americas LLC, ArcelorMittal

Dofasco Inc., and ArcelorMittal USA Inc. participated as Defendant-Intervenors in this

consolidated action.  Finally, Chrysler LLC, Ford Motor Company, General Motors

Corporation, Honda of America Mfg., Inc., Honda Trading America Corporation,

Mercedes-Benz U.S. International, Inc., Nissan North America, Inc., and Toyota Motor

North America, Inc. (together, the "Auto Producers") participated as Amici Curiae in

support of the ITC's determination pertaining to its decision on Australia, Canada,

France and Japan.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C.

§ 1516a(a)(2)(A)(i)(I) and (B)(iii) (2000).

## BACKGROUND

This consolidated matter stems from several appeals of the ITC's second sunset

review determination, for the period of review ("POR") 2000 to 2005, concerning

corrosion-resistant carbon steel products ("CoRe steel" or "subject imports") from

Australia, France, Japan, Germany, Korea and Canada.  Certain Carbon Steel Products

From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea,

Mexico, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom, Inv. Nos.

AA1921-197 (2d Review); 701-TA-319, 320, 325-327, 348, and 350 (2d Review); and 731-

TA-573, 574, 576, 578, 582-587, 612, and 614-618 (2d Review), USITC Pub. No. 3899

(January 2007) (C.R. 831 or P.R. 940) ("2007 Commission Views").[1]

In 1993, the ITC found that unfairly-traded imports of corrosion-resistant CoRe

steel from Australia, Canada, France, Germany, Japan and Korea were causing material

injury to the domestic industry.  See Certain Flat-Rolled Carbon Steel Products from

---

[1]The Administrative Record in this case consists of two versions, a Confidential Record ("C.R.") and a Public Record ("P.R.").  In this Opinion, documentary references are made to documents drawn from either version.  For example, C.R. 831 refers to the Confidential Record, document number 831.

Argentina, Australia, Austria, Belgium, Brazil, Canada, Finland, France, Germany, Italy,

Japan, Korea, Mexico, the Netherlands, New Zealand, Poland, Romania, Spain, Sweden,

and the United Kingdom, USITC Pub. 2664, Inv. Nos. 701-TA-319-332, 334, 336-342, 344

and 347-353 (Final) and Inv. Nos. 731-TA-573-579, 581-592, 594-597, 599-609 and 612-619

(Final) (Aug. 1993) (P.R. 137) ("1993 Determination").  As a result, the Department of

Commerce published countervailing duty ("CVD") orders on CoRe steel from France

and Korea and antidumping duty ("ADD") orders on CoRe steel from Australia,

Canada, France, Germany, Japan and Korea.  See 2007 Sunset Review Information at

OVERVIEW-3 (P.R. 941).

      In 2000, the ITC conducted its first five-year sunset reviews of these orders.  In

this first sunset review, inter alia, the ITC exercised its discretion to cumulate all subject

imports together.  See Certain Carbon Steel Products from Australia, Belgium, Brazil,

Canada, Finland, France, Germany, Japan, Korea, Mexico, The Netherlands, Poland,

Romania, Spain, Sweden, Taiwan, and The United Kingdom, USITC Pub. 3364, Inv.

Nos. AA 1921-197 (Review), 701-TA-231, 319-320, 322, 325-328, 340, 342, and 348-350

(Review), and 731-TA-573-576, 578, 582-587, 604, 607-608, 612, and 614-618 (Review)

(Nov. 2000) at 47 (P.R. 124) ("2000 Sunset Determinations").  The ITC also found that

revocation of the ADD/CVD orders would result in the continuation or recurrence of

material injury.  Id. at 58.  Consequently, the ADD and CVD orders continued.

On November 1, 2005, the ITC instituted a second five-year sunset review of

these orders.  See Certain Carbon Steel Products From Australia, Belgium, Brazil,

Canada, Finland, France, Germany, Japan, Korea, Mexico, Poland, Romania, Spain,

Sweden, Taiwan, and United Kingdom, 70 Fed. Reg. 62,324 (Oct. 31, 2005); see also 2007

Sunset Review Information at OVERVIEW-1 (P.R. 941).

On February 6, 2006, the ITC decided to conduct full reviews pursuant to section

751(c)(5) of the Tariff Act of 1930, 19 U.S.C. § 1675(c)(5).  See Certain Carbon Steel

Products From Australia, Belgium, Brazil, Canada, Finland, France, Germany, Japan,

Korea, Mexico, Poland, Romania, Spain, Sweden, Taiwan, and the United Kingdom, 71

Fed. Reg. 8,874 (Feb. 21, 2006).  All parties engaged in this lawsuit actively participated

in all stages of these reviews.

On December 14, 2006, the Commission voted, and by a vote of four to two (4 to

2) determined that revocation of the orders on CoRe steel from Australia, Canada,

France and Japan would not be likely to lead to continuation or recurrence of material

injury to the domestic industry (i.e., a negative determination).  2007 Commission

Views at 1 (P.R. 940).  The ITC unanimously decided, however, that revocation of the

orders on CoRe steel from Germany and Korea would be likely to lead to a continuation

or recurrence of material injury to the domestic industry (i.e., an affirmative

determination.)  Id.  The ITC also decided on a subsidiary preliminary issue, by a vote

of four to two (4 to 2), to cumulate the subject imports into two groups: (i) Australia,

France and Japan; and (ii) Germany and Korea.  Id. at 106.  With respect to Canada, the

ITC decided not to cumulate Canadian CoRe steel imports with any of the subject

imports from the other countries.  Id.  These final determinations were published in the

Federal Register on January 31, 2007.  Certain Carbon Steel Products From Australia,

Belgium, Brazil, Canada, Finland, France, Germany, Japan, Korea, Mexico, Poland,

Romania, Spain, Sweden, Taiwan, and the United Kingdom, 72 Fed. Reg. 4,529 (Int'l

Trade Comm'n Jan. 31, 2007) (P.R. 932) ("Final Sunset Determination").

Plaintiffs/Plaintiff-Intervenors/Consolidated Plaintiffs subsequently filed

separate appeals to the U.S. Court of International Trade ("CIT") (Case Nos. 07-00071,

07-00075, 07-00076, and 07-00087), which were consolidated under this action (Consol.

Case No. 07-00071) on September 7, 2007, challenging, inter alia, the following agency

determinations: (1) the ITC's decision to cumulate the subject imports into two separate

groups—Australia/France/Japan and Germany/Korea; (2) its negative determination

with respect to CoRe steel from Australia, France & Japan; (3) its negative determination

with respect to CoRe steel from Canada, particularly its determination that the volume

of Canadian imports would not be significant if the orders were revoked; (4) the ITC's

decision to cumulate German CoRe steel imports with Korean CoRe steel imports; (5)

the ITC's affirmative determination with respect to imports of CoRe steel from

Germany and Korea; and finally (6) whether the ITC was required to apply an analysis

pursuant to the U.S. Court of Appeals for the Federal Circuit's ("CAFC") opinion in

<u>Bratsk Aluminum Smelter v. United States</u>, 444 F.3d 1369 (Fed. Cir. 2006).

Oral argument on these motions was held before this Court on November 5, 2008

in a partially-closed, partially-public session, due to the abundance of business

proprietary information throughout the parties' argument.

## STANDARD OF REVIEW

The court is required to uphold a sunset review determination by the ITC unless

it is "unsupported by substantial evidence on the record, or otherwise not in accordance

with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (2000).  A party "challenging the ITC's

determination under the substantial evidence standard 'has chosen a course with a high

barrier to reversal.'"  <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1358 (Fed. Cir.

2006) (internal citations omitted).  "Substantial evidence is more than a mere scintilla,"

it is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." <u>Consol. Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938) (citing

<u>Appalachian Elec. Power Co. v. N.L.R.B.</u>, 93 F.2d 985, 989 (4th Cir. 1938)).  There must

be "[a] rational connection between the facts found and the choice made" in an agency

determination if it is to be characterized as supported by substantial evidence and

otherwise in accordance with law.  <u>Burlington Truck Lines, Inc. v. United States</u>, 371

U.S. 156, 168 (1962).

    In determining the existence of substantial evidence, a reviewing court must

consider "the record as a whole, including evidence that supports as well as evidence

that 'fairly detracts from the substantiality of the evidence.'"  <u>Huaiyin Foreign Trade</u>

<u>Corp. v. United States</u>, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (<u>quoting</u> <u>Atl. Sugar, Ltd. v.</u>

<u>United States</u>, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  Moreover, the court must not

"displace the [agency's] choice between two fairly conflicting views, even though the

court would justifiably have made a different choice had the matter been before it de

novo." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1951).  "[I]t is not the

province of the Court to reweigh the evidence before the agency."  <u>Comm. for Fair</u>

<u>Beam Imports v. United States</u>, 31 CIT __, __, 477 F. Supp.2d 1313, 1326 (2007), <u>aff'd</u> 260

Fed. Appx. 302 (Fed. Cir. Jan. 11, 2008).  That said, "the agency must examine the

relevant data and articulate a satisfactory explanation for its action including a 'rational

connection between the facts found and the choice made.'"  <u>Motor Vehicle Mfrs. Ass'n</u>

<u>of United States v. State Farm Auto Ins. Co.</u>, 463 U.S. 29, 43 (1983) (<u>quoting</u> <u>Burlington</u>

<u>Truck Lines v. United States</u>, 371 U.S. 156, 168 (1962)).  However, the ITC is "presumed

to have considered all of the evidence on the record" and "is not required to explicitly

address every piece of evidence presented by the parties."  <u>Nucor Corp. v. United</u>

<u>States</u>, 28 CIT 188, 234, 318 F. Supp.2d 1207, 1247 (2004) (citation omitted), <u>aff'd</u>, 414

F.3d 1331 (Fed. Cir. 2005).  The ITC need not "make an explicit response to every

argument made by a party, but [current law] instead requires that issues material to the

agency's determination be discussed so that the 'path of the agency may reasonably be

discerned' by a reviewing court."  <u>Timkin U.S. Corp. v. United States</u>, 421 F.3d 1350,

1354 (Fed. Cir. 2005) (<u>quoting</u> Uruguay Round Agreements Act ("URAA"), Statement of

Administration Action ("SAA"), accompanying H.R. Rep. No. 103-826, at 892); <u>see also</u>

<u>Ceramica Regiomontana, S.A. v. United States</u>, 810 F.2d 1137, 1139 (Fed. Cir. 1987).

        Where granted statutory discretion, ITC determinations remain subject to review

for abuse of discretion.  <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402,

416 (1971) (The standard is "whether the decision was based on a consideration of the

relevant factors and whether there has been a clear error of judgment.").

        On questions of law, the Court is guided by U.S. Supreme Court precedent

holding that, unless contrary to the "unambiguously expressed intent of Congress," the

agency's interpretation of the statute it administers must be upheld if that interpretation

is "permissible."  <u>Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837, 843

(1984).  Consequently, a degree of deference is owed to the agency when it interprets

the statute it administers and "[w]hether we would come to the same conclusion, were

we to analyze [it] anew, is not the issue."  <u>Suramerica de Aleaciones Laminadas, C.A. v.</u>

<u>United States</u>, 966 F.2d 660, 665 (Fed. Cir. 1992).

D<small>ISCUSSION</small>

**I.    The ITC's Cumulation Determination Is Supported by Substantial Evidence on the Record and Is Otherwise in Accordance with Law.**

**A.    Cumulation ~ Statutory Framework**

The ITC is required to conduct a sunset review every five years after publication of an antidumping duty order, a countervailing duty order, or a prior sunset review. See 19 U.S.C. § 1675(c)(1).  In a five year sunset review the ITC decides, inter alia, "whether revocation of an order . . . would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time."  19 U.S.C. § 1675a(a)(1) (2000).  The ITC must evaluate "the likely volume, price effect, and impact of imports of the subject merchandise on the industry if the order is revoked . . . ."  19 U.S.C. § 1675a(a)(1).  In making this material injury determination, the ITC, in its discretion,

> may cumulatively assess the volume and effect of imports of the subject merchandise from all countries with respect to which reviews under section 1675(b) or (c) of this title were initiated on the same day, if such imports would be likely to compete with each other and with domestic like products in the United States market.

19 U.S.C. § 1675a(a)(7) (2000) (emphasis added); see Nippon Steel Corp. v. United States, 494 F.3d 1371, 1374 n.4 (Fed. Cir. 2007) (ITC may cumulatively assess the volume and effect of subject imports from several countries for purposes of the material injury

analysis, so long as certain threshold requirements are met.)

The cumulation statute does, however, limit the ITC's discretionary authority; the agency "<u>shall not</u> cumulatively assess the volume and effects of imports of the subject merchandise in a case in which it determines that such imports are likely to have no discernible adverse impact on the domestic industry."  19 U.S.C. § 1675a(a)(7) (emphasis added); <u>see also</u> SAA at 887 (The ITC may not "cumulate imports from any country if those imports are likely to have no discernable adverse impact on the domestic industry.").[2]  There is no statute enumerating "factors to . . . consider[] in determining whether subject imports from a particular country are likely to have no discernable impact."  <u>Usinor Industeel, S.A. v. United States</u>, 26 CIT 1402, 1408 (2002).

Indeed the ITC "Commissioners themselves differ as to approach."  <u>Id.</u> at 1408.

In addressing this query, the ITC's first question is

> whether the imports are likely to have any such impact.  If not, the ITC is precluded from cumulating.  If yes, then the question remains whether that impact is also adverse.  If affirmative, the agency is permitted to cumulate; if negative, cumulation is not permissible since any impact is not both discernible and adverse.

<u>Neenah Foundry Co. v. United States</u>, 25 CIT 702, 712-13, 155 F. Supp.2d 766, 775 (2001).

─────────────────────

[2]The SAA, by statute, "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d) (2000).

Congress granted the ITC's discretionary powers in order to account for the fact

that "competition from unfairly traded imports from several countries simultaneously

often has a <u>hammering effect</u> on the domestic industry [that] may not be adequately

addressed if the impact of the imports [is] analyzed separately on the basis of country of

origin." <u>Neenah Foundry Co.</u>, 155 F. Supp.2d at 772 (<u>quoting</u> H.R. Rep. No. 100-40, part

1, at 130 (1987)) (emphasis added).  While the ITC's discretion here is not unfettered, its

"exercise of discretion [must] be predicated upon a judgment anchored in the language

and spirit of the relevant statutes and regulations." <u>Freeport Minerals Co. v. United</u>

<u>States</u>, 776 F.2d 1029, 1032 (Fed. Cir. 1985).  In summary, where the ITC exercises its

discretion to cumulate subject imports it may do so, only if, the sunset review was

> [(1)] initiated on the same day, [and (2)] if such imports would
> be likely to compete with each other and with domestic like
> products in the United States market.  [However, (3)] [t]he
> Commission shall not cumulatively assess the volume and
> effects of imports of the subject merchandise in a case in which
> it determines that such imports are likely to have no
> discernible adverse impact on the domestic industry.

19 U.S.C. § 1675a(a)(7) (2000).

### B.    The ITC's Cumulation Determination

In this second sunset review the ITC majority decided[3] to exercise its discretion

---

[3]Commissioners Stephen Koplan and Charlotte R. Lane both dissented from the
ITC majority's determination.  <u>See</u> note 8, <u>infra</u>.  They, however, joined the majority in
"its determination regarding legal standards . . . background, domestic like product,
and domestic industry."  2007 Commission Views at 147; 147-175 (P.R. 940).

to cumulate the subject imports from certain countries.  2007 Commission Views at 108

(C.R. 831).  The ITC considered the following enumerated issues in deciding whether or

not to cumulate:

> (1) whether imports from any of the subject countries are
> precluded from cumulation because they are likely to have no
> discernible adverse impact on the domestic industry; (2)
> whether imports of corrosion-resistant steel from the subject
> countries are likely to compete with each other and with the
> domestic like product according to the traditional four-factor
> test; and (3) other considerations, such as similarities and
> differences in the conditions of competition of the subject
> countries with regard to their participation in the U.S. market.

Id. at 106-107.  Following an analysis, the ITC determined that it would cumulate

subject goods into the following country groups: (1) Australia, France and Japan; (2)

Germany and Korea; and (3) Canada, set off by itself, not cumulated.  Id. at 108.  The

ITC's initial determination was based on its finding that all subject imports would have

a discernible adverse impact on the U.S. industry, and that there was a reasonable

overlap in competition among imports from all six countries and the U.S. industry.  Id.

at 108, 119.

Specifically, the ITC found that subject goods from Canada would likely compete

under different conditions of competition than those of the other countries and thus

declined to cumulate Canadian subject imports with the other subject countries.  Id. at

108.  With respect to Germany and Korea, the ITC found that the conditions of

competition were similar to each other, but also different from the other countries and

therefore it exercised its discretion to cumulate German and Korean subject imports

separately from the other four countries.  Id.  Finally, the ITC decided to exercise its

discretion to cumulate Australian, French and Japanese subject imports with each other

as they face similar conditions of competition.  Id.

     C.     **Contentions of the Parties ~ Australia, France & Japan**

        1.  Nucor, SDI, AK Steel ("Joint Plaintiffs"), and U.S. Steel ("USS")

Joint Plaintiffs and USS[4] first challenge the Commission's decision to cumulate

subject imports from Australia, France and Japan with each other, but apart from

Canada, Germany, and Korea.  They contend that such decision is not supported by

substantial evidence and is not otherwise in accordance with law.  (See Joint Mem. In

Support of Pl.'s Joint Mot. For Judgment On Agency Record ("Joint Pl.'s Br.") at 17;

Mem. In Support of Mot. for Judgment On the Agency Record by Pl.-Intervenor USS

("USS Br.") at 11-12.)  Joint Plaintiffs and USS argue that the ITC erred by (1) failing to

exercise its discretion to cumulate in a manner consistent with the statute and

congressional intent; (2) failing to apply the correct "conditions of competition" analysis

─────────────────────

    [4]In a letter to the Court, USS indicated that "it will be participating in this consolidated proceeding and challenging the ITC's negative determinations with respect to Australia, Japan, and France, and defending the ITC's affirmative determination with respect to Germany."  Letter of United States Steel Corp., dated September 14, 2007 (Docket No. 58).

in its cumulation decision and failing to apply it on a counterfactual basis; and (3)

failing to cumulate subject imports from Australia, France and Japan together with

Canada, Germany and Korea.  (Joint Pl.'s Br. at 17-38; USS Br. at 10-24.)

> a.   *Joint Plaintiffs & USS argue that the ITC's cumulation decision*
>      *was erroneous.*

Joint Plaintiffs & USS contend that the ITC failed to follow the cumulation

statute.  They argue that 19 U.S.C. § 1675a(a)(7) sets out the sole factors that the ITC

may consider in the exercise of its discretion of whether to cumulate subject imports.

(Joint Pl.'s Br. at 17-18; USS Br. at 11-12.)  Specifically, two of the four ITC

commissioners comprising the majority—Chairman Pearson and Commissioner

Okun—"disregarded the prescribed statutory requirements for making a cumulation

determination in favor of a test that is not in the statute, i.e., considering only the

'conditions of competition.'" (Joint Pl.'s Br. at 19; see also USS Br. 14-18.)  Further, Joint

Plaintiffs & USS argue that when Chairman Pearson's and Commissioner Okun's

"extra-statutory analysis" excluded a country from cumulation, they then failed to

consider the actual statutory factors—no discernible adverse impact and the likelihood

of a reasonable overlap of competition.  (Joint Pl.'s Br. at 20; see also USS Br. at 15-16.)

Joint Plaintiffs note that though the ITC has in the past "considered additional elements

. . . as part of [its] exercise of discretion, such consideration has been part of or ancillary

to the statutory criteria." (Joint Pl.'s Br. at 20.)  Joint Plaintiffs conclude that because the

ITC disregarded the statute, the Commission's analysis was incomplete.  (Joint Pl.'s Br.

at 22.)  Moreover, USS contends that the extra statutory factors that these *refusenik*

Commissioners employed "do <u>not</u> go to the question of whether imports from the

countries at issue will contribute to the hammering effect" but instead represent a

"misunderstand[ing of] the meaning of the Court's ruling in <u>Allegheny Ludlum</u>[5] . . .

treating it as giving the Commission <u>carte blanche</u> to do anything that they want in

addressing cumulation issues in five year reviews."  (USS Br. 14-15 (emphasis in

original).)

> *b.*     *Joint Plaintiffs & USS argue that the ITC's "conditions of*
> *competition" analysis was flawed.*

Joint Plaintiffs also contend that in spite of the ITC's "extra-statutory analysis,"

its application of the "conditions of competition" analysis was nevertheless flawed

because it considered the conditions of competition impacting the <u>foreign</u> industry or

<u>foreign</u> producers, and not the <u>domestic</u> industry as the statute requires.  (Joint Pl.'s Br.

at 22.)  Both Joint Plaintiffs and USS cite the first sunset review as precedent where the

ITC "correctly employed the 'conditions of competition' analysis" and cumulated all

subject countries together.  (Joint Pl.'s Br. at 22-23 (<u>citing</u> 2000 Sunset Determinations at

---

[5]<u>Allegheny Ludlum Corp. v. United States</u>, 30 CIT __, __, 475 F. Supp.2d 1370, 1376-78 (2006) (Noting that an agency's "exercise of discretion [must] be predicated upon a judgment anchored in the language and spirit of the relevant statute and regulations.").

16, 49-51 (P.R. 124)); see also USS Br. at 12-13.)  In the second sunset review, Joint

Plaintiffs and USS argue that the ITC inexplicably "departed from the [conditions of

competition] analysis used in the first [sunset] review," which was a sharp departure

from its previous practice and was therefore "ultra vires of the [cumulation] statute."

(Joint Pl.'s Br. at 23-24; see also USS Br. at 12-13.)  Specifically, they argue, the ITC

"erroneously focused on differences . . . in which foreign producers competed in the

U.S. market and failed to consider any conditions of competition with respect to the

domestic industry."  (Joint Pl.'s Br. at 24 (citing 2007 Commission Views at 8-9, 111-117

(P.R. 940)).)  These extra-statutory considerations employed by the ITC, Joint Plaintiffs

argue, are irrelevant to the Commission's cumulation analysis, i.e., they have "no

bearing on what effect subject imports will have on the conditions of competition in the

U.S. market."  (Id.)

Grounding its argument in the cumulation statute's legislative history, USS

contends that the use of the ITC's discretion must be "guided, first and foremost, by a

consideration of the reasons why cumulation is provided for by the statute."  (USS Br. at

12-13 (emphasis in original).)  USS then compares the legislative history for the

mandatory cumulation statute for injury investigations (see 19 U.S.C. § 1677(7)(G)) with

the legislative history for the cumulation statute at issue here, to argue that (i)

"Congress regards cumulation as a 'critical component' of the antidumping and

countervailing duty laws"; and (ii) that the ITC must relegate its focus to specific factors

in order to assess whether imports from a particular country are likely to contribute to

the "hammering effect"[6] of imports from multiple sources.  (USS Br. at 13-14.)

USS also attacks the fact that both Chairman Pearson and Commissioner Okun

"never considered whether imports from all five countries [Australia, France, Japan,

Germany and Korea] were likely to compete with each other and with the domestic like

product, and never examined whether imports from each of these countries were likely

to have a discernible adverse impact on the domestic industry."  (Id. at 15-16.)

Consequently, USS argues, neither of these commissioners followed section 1675a(a)(7),

nor cited any authority to justify their departure,[7] nor were concerned with the

hammering effects of imports, and thus "plainly violated the intent of Congress."  (Id. at

15-17 n.4.)

---

[6]The purpose of cumulation is "to stem competition from unfairly traded imports
from several countries simultaneously [which] often has a hammering effect on the
domestic industry . . . [that] may not be adequately addressed if the impact of the
imports are [sic] analyzed separately on the basis of their country of origin."  H.R. Rep.
No. 100-40, part 1, at 130 (1987).

[7]Chairman Pearson and Commissioner Okun cited as authority here, their
dissent in another five year review.  See Stainless Steel Bar from Brazil, India, Japan, and
Spain, USITC Pub. 3895, Inv. Nos. 731-TA-678, 679, 681, and 682 (2d Review) (Dec.
2006).  USS argues that this citation "sheds no additional light on [the] subject."  (USS
Br. at 16.)

USS additionally challenges the Commission majority's[8] findings as the factual

basis for declining total cumulation.  The "alleged" differences in the conditions of

competition, which USS argues were significant to the Commission, "are wholly

irrelevant to the purpose of cumulation, internally inconsistent, or both."  (USS Br. at

18.)  That the majority focused on the Australian, French and Japanese producer's "lack

of interest in the U.S. market to any significant degree" (as evidenced by the low levels

of subject imports) "is totally misplaced."  (Id.)  USS dismisses the significance of the

ITC's finding of "low levels of subject imports" since ADD/CVD orders "almost

invariably" limit imports.  (Id.)

    Joint Plaintiffs and USS also contend that the ITC's finding that the French and

Japanese producers have no interest in the U.S. market because they are more likely to

supply the U.S. market from their U.S. affiliates' production base, is erroneous.  (Joint

Pl's Br. at 35-36; USS Br. at 23-25.)  First, they argue that the ITC rejected a similar

affiliation argument made by Japan during the first sunset review.  Second, USS

proffers that the record contains no direct evidence regarding the behavior of French

---

[8]Commissioners Koplan and Lane dissented from the majority, inter alia, on the issue of cumulation, and voted to cumulate all the subject countries together after finding that there were no likely "significant differences in conditions of competition" among the subject producers.  See Separate and Dissenting Views of Commissioner Stephen Koplan and Commissioner Charlotte R. Lane with respect to Certain Carbon Corrosion-Resistant Steel, 2007 Commission Views at 161, 147-161 (P.R. 940) and at 152-184 (C.R. 832) ("Dissenting Views").

producers with U.S. affiliates, since the only such relationship, the Arcelor/Mittal

merger, was scheduled to take effect in early 2007, after the ITC's vote on the second

review.  (Id. at 24 (citing 2007 Determinations at 128-29 (P.R. 940)).)  Finally, USS cites to

the Final Staff Reports pointing out that the Japanese producers actually reduced their

U.S. presence due to the acquisition of National Steel by U.S. Steel during the current

POR.  (Id. at 24-25 (citing Final Staff Report at CORE-III-2 (P.R. 652)).)

## 2. Defendant ITC

Defendant maintains that the Commission's exercise of discretion to cumulate

imports into three separate groups is supported by substantial evidence on the record

and is otherwise in accordance with law.  The ITC argues that the Commission

cumulated certain countries because it found that the "three groups of countries 'likely

would compete under different conditions of competition than would the other

countries.'" (Mem. of Def. U.S. Int'l Trade Comm'n In Opp. To Pl.s' Mots. For Judgment

on Agency R. ("ITC Resp. Br.") at 14 (quoting 2007 Commission Views 8-9 (C.R. 831)).)

> a.     *The ITC argues in response that it has statutory discretion to
> cumulate, its analysis thereunder was in accordance with law, and
> supported by substantial evidence.*

The ITC maintains that it has been granted discretion by Congress to decide

whether to cumulate during sunset reviews.  (ITC Resp. Br. at 15 (citing 19 U.S.C. §

1675a(a)(7)).)  Additionally, the ITC contends that CIT precedent recognizes that the

"Commission 'has wide latitude in selecting the types of factors it considers relevant'

for that purpose." (Id. at 16 (quoting Allegheny Ludlum, 475 F. Supp.2d at 1380).)

The ITC retorts contending that Joint Plaintiffs' and USS's cumulation arguments

are "seriously flawed." Mainly, the Commission has statutory "discretion not to

cumulate imports from the subject countries even if it finds that the subject imports will

have a discernible adverse impact on the industry and that there is a reasonable overlap

of competition between them and the domestic like product." (Id. at 16-17 (emphasis in

original).) Neither does the ITC's "conditions of competition" analysis contravene the

cumulation statute nor avoid the issue of the "hammering effects" of unfairly traded

imports because, the sunset review statute does not mandate cumulation in the first

instance. (Id.) The ITC frames the issue for the Court as thus: it is "not whether the

Commission could reasonably have cumulated all imports from the subject countries

because they might have some 'hammering' effect on the industry, but instead whether

the Commission's cumulation decisions represent a reasoned exercise of its discretion

under the statute." (Id. at 18.)

The ITC also argues that its cumulation determination was supported by

substantial evidence and that Joint Plaintiffs' and USS's arguments to the contrary

"merely reflect disagreements with how the Commission weighed the evidence." (Id. at

24-25; 24-43.) As a result, because the Joint Plaintiffs and USS fail to show that the ITC's

cumulation findings are unreasonable, the Commission decision must be upheld.  (See

id.)

        3.  <u>Defendant-Intervenors ~ JFE Steel Corp., et al.</u>

      The Court finds that JFE Steel Corp.'s, et al., cumulation arguments are

substantially similar to those presented by the ITC.  (Br. Def.-Interv. JFE Steel In Opp. to

Pl.'s Mot. For Sum. Judgment Br. at 7–22.)  Therefore, the Court will not recount them

one by one in this opinion, although they have been carefully considered.

     **D.**    **Contentions ~ Canada**[9]

        1.  <u>AK Steel</u>

      Plaintiff AK Steel argues that the ITC's decision not to cumulate CoRe steel from

Canada with any other subject country was not supported by substantial evidence.

(Joint Pl.'s Br. at 28-34; Reply Br. of AK Steel at 2-9.)  AK Steel contends that contrary to

the ITC's finding—that Canadian producers compete in the U.S. market under

substantially similar conditions of competition as faced by Australia, France, Japan,

Germany, and Korea—"there is no basis not to cumulate imports from Canada with

imports from other countries."  (Joint Pl.'s Br. at 28-29.)  Because CoRe steel in the U.S.

competes on the basis of price, AK Steel argues, the ITC's analysis that a [[       ]]

---

     [9]Plaintiffs Nucor and SDI did not appeal the ITC's determination with respect to
Canada and thus did not join the arguments in their joint brief with AK Steel addressing
Canada. (Joint Pl.'s Br. at 1 n.1.)

Canadian producer's increased exports to the U.S. during the POR "were not due to

price competition with U.S. suppliers" is contradictory.  (Id. at 29 (citing 2007

Commission Views at 115 (C.R. 831)).)  AK Steel cites to the questionnaire responses of

Auto Producers as support for this argument—that price is an important factor in the

U.S. CoRe steel market—and proffers that Canadian CoRe is equally competitive in the

U.S. on price.  (Id. at 29-31.)

　　　AK Steel also contends that the "perception" by certain Auto Producers that U.S.

and Canada are "a unified market for production and sourcing decisions" is "legally

irrelevant" to whether the ITC properly decided not to cumulate Canada's CoRe steel

imports with the other countries.  (Id. at 31.)  Such a distinction, AK Steel argues, is not

recognized by the statute.  (Id. at 31-32 (citing Dissenting Views, at 2007 Commission

Views at 159 n.123 (P.R. 940)).)

　　　AK Steel further argues that the ITC failed to consider the record evidence that

Canadian producers also export CoRe steel to the U.S. for "non-automotive

applications."  (Id. at 33.)  Thus, the ITC failed to consider the possible effects of an

order revocation and whether Canadian imports would increase in the non-automotive

sector as well. (Id.)  AK Steel cites the ITC Final Staff Report, which notes that during

the POR "the majority of Canadian mills shipments of CoRe steel is [sic] for solid non-

automotive applications."  (Id. (referring to Final Staff Report CORE-IV-30 (C.R. 742).))

AK Steel asserts that since the record demonstrates that there is a "sufficient degree of fungibility among the subject imports and with the domestic product" the ITC's reliance on Auto Producers' "perception" of a unified market to differentiate Canada from the other subject nations is unsupported by substantial evidence.  (Id. at 34.)

Finally, AK Steel points out that the ITC "should have considered Canada's substantial excess capacity."  (Id.)  AK Steel argues that Canada's significant excess capacity would easily permit Canadian export expansion into "other sectors and purchasers beyond the automotive sector" if the orders were lifted.  (Id. (see Final Staff Report at Table CORE-IV-20 and CORE-IV-30 (C.R. 742)).)

    2.  Defendant ITC

The ITC argues in response that it exercised discretion reasonably when it decided not to cumulate subject imports from Canada with any other country and that this decision was supported by substantial evidence.  (ITC Resp. Br. at 27-28, 34-36.) The Commission found that, among the subject countries, the Canadian industry was characterized by a condition of competition that was unique "because auto producers and auto parts suppliers considered the United States and Canada as a unified market for production and sourcing decisions."  (ITC Resp. Br. at 27.)  Moreover, "Canada was a net importer of corrosion-resistant steel, with U.S. exports to Canada exceeding exports from Canada to the United States during the period of review."  (Id.)

The ITC also argues that AK Steel's position that the Auto Producers' own

questionnaires are contradictory, falls flat.  (Id.)  The ITC pointed out, for example, that

[[




]] (Id.)  Also since Canada did not

export CoRe to China, "any build-up in Chinese capacity would not result in any

diversion of Canadian exports to the United States from China or Asia."  (Id. at 28

(citing 2007 Commission Views at 114-116 (C.R. 831)).)

The Commission did not ignore Canada's excess capacity, it argues, but

addressed this factor as but one among many.  The ITC cited to "other significant

competition factors [that] warranted . . . not cumulating subject imports from Canada."

(Id. at 35.)  Such factors, the ITC argues, included the unified nature of the

U.S./Canadian CoRe auto market, Canada's consistent supply of imports to the U.S. for

non-price reasons, Canada's status as a net importer of CoRe steel (mostly from the

U.S.), and the proportion of imports from Canada that were specialty automotive

products.  (Id. at 35-36 (citing 2007 Commission Views at 114-116, 140 (C.R. 831)).)

Finally, the ITC argues that the record contains ample evidence in support of its

finding that Auto Producers treat Canada and the U.S. as a unified market.  (Id. at 36

(citing 2007 Commission Views at 114, n.665, 126, n.762 (C.R. 831)))  This evidence is

consistent with the ITC's findings, it argues, that there is a growing global trend toward

consolidations and mergers in steel producers that have enabled producers to serve

their customers' interest in obtaining CoRe steel locally or regionally.  (Id. (citing 2007

Commission Views at 123, 126 (C.R. 831)))

### 3.  Defendant-Intervenor ArcelorMittal Dofasco, Inc.

Defendant-Intervenor ArcelorMittal Dofasco Inc. ("Dofasco") argued in support

of the ITC's cumulation findings with respect to Canada.  The Court finds Dofasco's

arguments are substantially similar to those presented by the ITC and therefore, the

Court will not recount them one by one in this opinion, although they have been fully

considered.

### 4.  Amici Curiae ~ Auto Producers

The Amici Curiae Auto Producers[10] support the ITC's negative determinations

concerning the ADD and CVD orders on CoRe steel from Australia, France, Japan and

Canada.  On cumulation, Auto Producers argue that the ITC decision to not cumulate

CoRe steel imports from Canada with any other subject country, due to "different

conditions of competition," was supported by substantial evidence.  (Auto Prod. Br. at

---

[10]The Auto Producers, which may be the largest domestic consumers of CoRe steel, "account for approximately 87% of U.S. vehicle production" and purchased some 47.6% of CoRe steel shipments to the U.S. market. (Auto Prod. Br. at 7 & n.3.)

36.)

Auto Producers challenge Joint Plaintiffs' and USS's characterization of Auto

Producers' agency testimony as "legally irrelevant."  (<u>Id.</u>)  In testimony before the ITC

Auto Producers explained to the commissioners that the auto industry views the U.S.

and Canada as a "unified market for production and sourcing."  (<u>Id.</u> at 36 (<u>citing</u> 2007

Commission Views at 112 (P.R. 940)).)  Auto Producers contend that "the statute

permits the Commission to address any conditions of competition it believes are

relevant in determining whether to cumulate subject imports."  (<u>Id.</u> at 37.)  Moreover, as

a factual basis to its decision, the ITC considered the "way in which shipments from

Canada compete in the U.S. market [which] distinguishes them from other subject

imports."  (<u>Id.</u>)  Auto Producers argue that the ITC correctly decided to distinguish

Canadian CoRe in its cumulation decision by relying on record evidence that

demonstrates Auto Producers' CoRe steel sourcing preference from North American

suppliers.  (<u>Id.</u> at 37-38.)  Finally Auto Producers note that their testimony to the ITC

demonstrated another distinguishing feature of the Canadian CoRe steel market.  Auto

Producers "frequently source CoRe for their Canadian production operations from U.S.

CoRe producers, and vice versa."  (<u>Id.</u> at 38.)  Auto Producers conclude that this record

evidence further promotes the argument that the ITC made a correct cumulation

determination.  (<u>Id.</u>)

The Court finds Auto Producers' remaining arguments on cumulation, including those made at Oral Argument, are substantially similar to those presented elsewhere by other parties and thus, the Court need not recount them in this Opinion, although they have been fully considered.

E.    **Contentions ~ Germany & Korea**

1.    German Plaintiffs[11]

German Plaintiffs argue that the ITC's determination to cumulate German subject imports with subject imports from Korea is not supported by substantial evidence or is not otherwise in accordance with law.  (German Pl.'s Br. at 9-36.)

First, German Plaintiffs focus on the ITC's "discernible adverse impact analysis" and argue that it is not supported by substantial evidence or is not otherwise in accordance with law.  (Id. at 9 (citing 19 U.S.C. § 1675a(a)(7)).)  The German Plaintiffs contend that the "record evidence in this review establishes an absence of available excess capacity and export orientation, and the lack of any economic incentive to direct German CoRe exports to the U.S. market."  (Id. at 10.)  Thus, they argue, the ITC's conclusion that German CoRe steel imports would not be likely to have "no discernible adverse impact" on the U.S. industry if the orders were revoked is "unreasonable."  (Id.

---

[11]Auto Producers take no position with respect to the appeal of the German Plaintiffs challenging the ITC's affirmative determination over CoRe steel imports from Germany.  (Amici Br. at 2 n.2.)

at 10.)

Next, German Plaintiffs assert that the ITC's exercise of discretion to cumulate German CoRe steel imports with Korean CoRe steel imports is not supported by substantial evidence or is otherwise not in accordance with law.  (Id. at 22.)  The German Plaintiffs argue that "[c]onsidering the unique competition factors for German CoRe in the U.S. market" the ITC's cumulation determination was wrong. (Id. at 23, 24 (citing Neenah Foundry Co. v. United States, 25 CIT 702, 708, 155 F. Supp.2d 766, 771 (2001) (ITC justified in refusing to cumulate when "one nation's exports developed trends in the U.S. market that were distinct from the market patterns of other countries' competing exports.")).)

Third, German Plaintiffs contend that the ITC's cumulation decision is "inconsistent with past practice and sets precedent[12] not anchored in the language and spirit of the antidumping laws."  (Id. at 32.)  The German Plaintiffs challenge the ITC's conclusion that German/Korean producers' current lack of a significant U.S. presence,

---

[12]German Plaintiffs argue that the ITC's practice of evaluating specific competition factors, such as differences in volume and price trends, in declining to cumulate, "constitutes agency practice" and therefore "there is no rational basis for the Commission to ignore such practice and cumulate Korean and German producers" together.  (German Pl.'s Br. at 30-32 n.37 (citing e.g., Stainless Steel Wire Rod from Brazil, France, and India, USITC Pub. 3866, Inv. Nos. 731-TA-636-638, at 11–14 (July 2006) (Second Review) ("not cumulating French imports based on, inter alia, higher prices and a closer relationship to its regional market, the EU"); Torrington Co. v. United States, 16 CIT 220, 229-31, 790 F. Supp. 1161, 1171–73 (1992) ("affirming the ITC's determination not to cumulate when, inter alia, pricing and volume trends differed")).)

through local domestic affiliations, demonstrates their inability to exercise their "strong

interest" in the U.S. market in ways that are not anti-competitive.  (<u>Id.</u> at 32–33.)

Germain Plaintiffs find that such a conclusion is not only speculative and unsupported

by substantial evidence but very likely prejudicial and "inconsistent with antidumping

law."  (<u>Id.</u> at 32-36.)

 Finally, the German Plaintiffs argue that, if cumulation is appropriate at all,

German CoRe imports "should have been cumulated with the Australian, French, and

Japanese respondents given the similarities in competition factors."  (<u>Id.</u> at 34.)  The

German Plaintiffs then detail the similarities between themselves and the Australian,

French and Japanese producers.  (<u>Id.</u> at 34-36.)

 2.  <u>Defendant ITC</u>

 In defense of its determination to cumulate German and Korean imports

together, the ITC stresses that a discernible adverse impact analysis "'is relatively easy

. . . to satisfy.'" (ITC Resp. Br. at 37 (<u>quoting</u> <u>Wieland-Werke AG v. United States</u>, No.

06-00135, Slip Op. 07-163 at 16-17 (Ct. Int'l Trade Nov. 7, 2007)).)

 The ITC argues that it did not ignore the fact that the German producers reported

[[   ]] capacity utilization in January to June 2006.  (<u>Id.</u> at 38.)  Instead, the ITC

"reasonably concluded" that German producers reported [[                    ]] in every

other portion of the POR and that there were significant fluctuations year-to-year in

their [[                              ]] levels.  (Id.)  Further, the ITC determined that "German

producers would have available capacity in the reasonably foreseeable future."  (Id.

(citing 2007 Commission Views at 109, n.629 (C.R. 831)))

The ITC also contends that it specifically addressed evidence that a significant

portion of German Plaintiffs' CoRe shipments during the POR were to home and

regional (i.e., European Union ("E.U.")) markets.  (Id. (citing 2007 Commission Views at

109-110 (C.R. 831)))  Moreover, the ITC offers that it is the German Plaintiffs who

ignored evidence that German subject imports increased 63.5% — from 46,453 short tons

in 2000 to 75,941 short tons in 2005. (Id. (citing 2007 Commission Views at 110 (C.R.

831)))

Responding to German Plaintiffs' criticism that the Commission failed to credit

the domestic industry's vulnerability in its discernible adverse impact analysis, the ITC

argues that while "on occasion," it may consider the domestic industry's vulnerability

in conducting a discernible adverse impact analysis, doing so is neither a statutory

requirement nor a regular ITC practice.  (Id. at 38-39.)

The ITC next addresses a litany of German Plaintiffs' arguments that it "failed to

consider" certain evidence.  (Id. at 39-41.)  In sum, the ITC contends that it did not

ignore any of this evidence but "merely came to different, albeit reasonable,

conclusions."  (Id. at 39 (emphasis in original).)  In the end, the ITC argues, "product

type and end uses" did not sufficiently distinguish German imports from that of any

other country. (<u>Id.</u> at 40.)

The ITC argues that "the salient facts underlying [its] decision to cumulate"

German and Korean imports "were each country's interest in supplying, and ability to

access, the United States market." (<u>Id.</u> at 42.)  Evidence from the record indicated:

- • Significant and increasing levels of CoRe during the POR;
- • Exports to Canada and Mexico;
- • Thyssen's intentions to open a U.S. facility but its inability to do so in the reasonably foreseeable future'
- • Thyssen's affiliation with a U.S. distributor of CoRe steel;
- • Germany's and Korea's lack of affiliations with U.S. producers.

(<u>Id.</u>)

### 3.  <u>Defendant-Intervenors ArcelorMittal USA Inc., Nucor Corp. & SDI, and USS</u>

Defendant-Intervenors ArcelorMittal USA Inc. ("Arcelor") and USS argued in

support of the ITC's findings with respect to Germany.  (Arcelor's Br. In Resp. to

German Pl's Mot. For Jmt. On Agency R. at 10-40; USS's Br. In Opp. To German Pl's

Mot. For Jmt. On Agency R. at 4-39.)  The Court finds that Arcelor's and USS's

arguments are substantially similar to those presented by the ITC and therefore, the

Court will not recount them in this opinion, although they have been helpful and fully

considered.

Nucor Corp. and SDI, in their capacity as Defendant-Intervenors, raise points

that are also substantially similar to many of the arguments raised by the other

defendant-intervenors, and the Court therefore will not recount them here one-by-one.

(Resp. Br. of Nucor Corp. and Steel Dynamics, Inc. ("Nucor/SDI Resp. Br.") at 6-42.)

However, Nucor/SDI do raise a few additional arguments that warrant separate

presentation.

First, Nucor/SDI contend that German Pl.'s assertion that the E.U. is essentially

its "home market" is flawed and has previously been rejected by the ITC.  (Nucor/SDI

Resp. Br. at 16-18 (citing inter alia Usinor v. United States, 28 CIT 1107, 1135, 342 F.

Supp. 2d 1267, 1291 (2004) (upholding an ITC determination rejecting German/French

arguments that the E.U. was their home market rather than Germany and France

respectively)).)

Nucor/SDI next argue that German Plaintiffs "confuse and conflate the

cumulation and likelihood of recurrence of material injury analyses."  (Nucor/SDI Resp.

Br. at 23.)  Arguing that these are two separate analyses, Nucor/SDI contend that

German Plaintiffs' insistence that it is illogical for the ITC to find the domestic CoRe

steel industry no longer vulnerable, on the one hand, but find that "the domestic

industry is likely to bear a material negative impact" from German/Korean imports, on

the other hand, is a false choice.  (Id. at 23-25.)  Moreover, Nucor/SDI contend that,

notwithstanding German Plaintiffs' conflated arguments, the ITC's vulnerability

determination was not supported by substantial evidence and is otherwise not in

accordance with law.  (Id. at 25-27.)

Finally, Nucor/SDI argue that the Commission's determination "to segregate"

German and Korean producers from Australian, French and Japanese producers is

unsupported by substantial evidence and is otherwise not in accordance with law.  (Id.

at 28-32.)  This is because the ITC failed to appreciate the "minor distinctions between

Korean and German producers," dismissing them as "irrelevant," whereas the very

same distinctions were used to segregate Germany and Korea from Australia, France

and Japan.  (Id. at 29.)

F.    **Analysis ~ The Commissions' Cumulation Determination**

The statute is clear; in order for the ITC to exercise its discretion and

cumulatively assess the volume and effect of imports in a sunset review, the

Commission must have (1) initiated all the reviews to be cumulated on the same day;

(2) find that the subject imports to be cumulated would be likely to compete with each

other and with domestic like products in the U.S. market; and (3) determine that the

subject imports to be cumulated are each likely to have a "discernible adverse impact"

on the U.S. industry.  See 19 U.S.C. § 1675a(a)(7).

As drafted by Congress, the use of the cumulation statute in a sunset review is

discretionary.  Id.  Notwithstanding, even if the statutory predicates are met, there is an

express prohibition on cumulation where the ITC "determines that [subject] imports are

likely to have no discernible adverse impact on the domestic industry."  Id.  This

exercise of discretion by the ITC, however, must be "predicated upon a judgment

anchored in the language and spirit of the relevant statutes and regulations."  Freeport

Minerals Co. v. United States, 776 F.2d 1029, 1032 (Fed. Cir. 1985).

        At the outset, no challenge has been posed to the initial element for

cumulation—that the sunset reviews be initiated on the same day—and therefore the

Court need not address this factor in its analysis.  The Court then turns to the remaining

statutory requirements/prohibitions: (1) that there is likely no discernible adverse

impact on the domestic industry from the subject imports; and (2) that the subject

imports are likely to compete both with each other and with the domestic like product

in the U.S. marketplace.  See 19 U.S.C. § 1675a(a)(7).

        1.      Likelihood of No Discernible Adverse Impact

        The ITC initially did not find applicable the "no discernible adverse impact"

exception to cumulation to any of the subject countries, which would have prevented

the exercise of its discretion to cumulate.  See 2007 Commission Views at 108, 119 (C.R.

831)).)  The ITC made specific findings with respect to the subject countries[13] in order to

_____

        [13]With respect to Canada, because the ITC declined to cumulate subject imports
from Canada with those of any other country, it did not find it necessary to "decide the

ascertain whether the subject imports from them were likely to have a discernible

adverse impact (or not) upon the domestic industry.  The ITC found that with regard to

Australia,[14] France,[15] Japan,[16] Germany,[17]

---

issue of no discernible adverse impact" element with respect to Canada.  2007 Commission Views at 108 (C.R. 831) (The ITC "find[s] it unnecessary to decide the issue of no discernible adverse impact" because it "decline[d] to cumulate subject imports from Canada with those from any other subject countries on the basis of differences in likely conditions of competition").

[14]The ITC found that with respect to Australia, the record indicated that its CoRe steel industry has significant production capacity, which has increased since the original investigation.  Australia's excess capacity was [[            ]] short tons in 2005 and its January-June 2006 capacity was [[        ]] short tons.  2007 Commission Views at 109 (C.R. 831).  There were "some [minimal] imports into the U.S. market" during the POR, reaching a maximum of 297 short tons in 2003 and dropping to 16 short tons in 2005.  Id. (citing C.R./P.R. Table CORE-I-1).  See also Final Staff Report at Tables 110-112 (C.R. 742).

[15]The ITC found that with respect to France, the record indicated that its CoRe steel industry has significant production capacity, which has increased since the original investigation.  France's production capacity went from [[            ]] short tons in 1992 to [[         ]] short tons in 2005.  2007 Commission Views at 109 (C.R. 831).  French producers' excess capacity was [[         ]] short tons in 2005 and its January-June 2006 capacity was [[          ]] short tons.  Id. (citing C.R./P.R. Table CORE-IV-29).  Notwithstanding the orders that were in place during the POR, there was a presence in the U.S. market by French producers, though at a declining rate.  Id.  French CoRe steel imports peaked in 2002 at 15,753 short tons and were 1,778 short tons in 2005.  Id. (citing C.R./P.R. Table CORE-I-1).  See also Final Staff Report at Tables 110-112 (C.R. 742).

[16]The ITC found that with respect to Japan, the record indicated that its CoRe steel industry had significant production capacity, which had increased since the original investigation.  Japan's production capacity went from [[            ]] short tons in 1992 to [[          ]] short tons in 2005.  2007 Commission Views at 110-111 (C.R. 831).  Japanese producers' excess capacity was [[         ]] short tons in 2005 and its January-June 2006 capacity was [[              ]] short tons.  Id. (citing C.R./P.R.

and Korea,[18] "the information on the record indicate[d] that the [CoRe steel] industry in

_____

Table CORE-IV-47).  Japanese CoRe maintained a presence in the U.S. market during the POR, peaking in 2000 at 27,543 short tons to a low of 16,762 short tons in 2005.  Id. (citing C.R./P.R. Table CORE-I-1).  See also Final Staff Report at Tables 110-112 (C.R. 742).

[17]With respect to Germany, the ITC found that the record indicated that its CoRe steel industry had increased both capacity and production from [[            ]] short tons of capacity in 1992 to [[            ]] short tons in 2005, and [[            ]] short tons of production in 1992 to [[            ]] short tons in 2005.  Germany's capacity utilization in 2005 was [[      ]]%, which was above that of the original investigation period; it had dropped from [[     ]]% in 1999, during the first POR.  2007 Commission Views at 109 (C.R. 831).  German producers' excess capacity was [[                    ]] short tons in 2005, equivalent to almost [[   ]]% of apparent U.S. consumption and U.S. production.  Id. (citing C.R./P.R. Tables C-7, CORE-IV-38).  The ITC found that while CoRe imports in this second POR were lower than in the first POR, they increased 63.5% from 2000 to 2005 from 46,453 short tons in 2000 to 75,941 short tons in 2005.  Id. at 110 (citing C.R./P.R. Table C-7).  The ITC also found that the German CoRe industry is "export-oriented" as exports accounted for over [[   ]]% of German shipments each year since 2000.  Id. (citing C.R./P.R. Table CORE-IV-38).  Finally, the ITC noted that the record reflected that German exports "to markets outside the EU increased in 2005, much of which was to the United States."  Id. at 110 n.632.

[18]With respect to Korea, the ITC found that the record indicated that imports of CoRe steel were 193,513 short tons in 1992.  2007 Commission Views at 111 (C.R. 831) (citing C.R./P.R. at Table CORE-I-1). Notwithstanding the orders, Korean producers substantially increased their exports to the U.S. during the POR "reaching a high of 330,858 short tons in 2005, or 1.5% of apparent U.S. consumption."  Id.  Korean CoRe producers reported "steady increases" in capacity from 3.1 million short tons in 1992 to 8.4 million short tons in 2005, but a drop in capacity utilization from 93.8% in 1992 to 87.0% in 2005.  Id. (citing C.R./P.R. at Table CORE-IV-54).  The ITC found that Korea's excess capacity was 1.1 million short tons in 2005.  Id.  In addition, the ITC found that Korean producers shipped substantial volumes of CoRe (28.8% of total shipments in 2005 (2.1 million short tons)) to countries other than the U.S., of which some 900,000 short tons went to markets outside of Asia.  Id.  This demonstrated a willingness to "seek out markets that are distant" from Korea.  Id. at 111; see also Final Staff Reports at 110-111, 113 (C.R. 742).

each of these subject countries has significant production capacity and has increased its

capacity since the original period of investigation." 2007 Commission Views at 111

(C.R. 831). In addition, the ITC found that the subject producers in each country have

"unused capacity," maintained some level of exports to the U.S. market, and

"undersold U.S. producers" periodically during the original investigation, and in some

cases, during the POR as well. Id.

This Court now addresses Joint Plaintiffs' and USS's argument that two of the

four commissioners in the majority—Chairman Pearson and Commissioner

Okun—"ignor[ed] the statutory factors" and "disregarded the prescribed statutory

requirements" for cumulation, and finds them to be without merit. (See Joint Pl.'s Br. at

19; USS Br. at 16.) A review of the record demonstrates to the Court that both Chairman

Pearson and Commissioner Okun exercised their discretion well-within the bounds of

the statute. Chiefly, Chairman Pearson and Commissioner Okun both explicitly stated

that they were joining the "no discernible adverse impact" analysis of their fellow

commissioners in the majority. See 2007 Commission Views at 107 n.612 (C.R. 831)

(Chairman Pearson and Commissioner Okun "join Vice Chairman Aranoff and

Commissioner Hillman's discussion of the [cumulation] issues . . . and reach the same

conclusion."). The perspective of Joint Plaintiffs and USS requires an overly narrow

reading of the cumulation statute contrary to the plain text of section 1675a(a)(7).

Stripped bare, Joint Plaintiffs' and USS's argument is that Chairman Pearson and

Commissioner Okun chose to conduct their cumulation analysis <u>in a different order</u>

than Vice Chairman Aranoff and Commissioner Hillman.  However, nothing in the

language of the cumulation statute requires the ITC to conduct its analysis in a

particular order.  When this Court examines section 1675a(a)(7), it finds that the statute

does not mandate any particular sequence of analysis.  Neither have Joint Plaintiffs nor

USS pointed to any authority that would require such a sequence; nor does the Court

find any such suggestion in its review of the legislative history.  <u>Cf.</u> <u>Nippon Steel Corp.</u>

<u>v. United States</u>, 25 CIT 1415, 1421 n.12, 182 F. Supp.2d 1330, 1337 n.12 (2001) ("neither

the governing statute nor its legislative history requires adoption of any particular

analysis") (internal citation and alteration omitted).

        The Court recognizes that the ITC is vested with statutory authority to exercise

discretion when it comes to cumulation in a sunset review.  <u>See</u> <u>Allegheny Ludlum</u>

<u>Corp.,</u> 475 F. Supp.2d at 1380-81 (The ITC "has wide latitude in selecting the types of

factors it considers relevant" in its cumulation analysis.).  The Commission is clearly

authorized to cumulate subject imports from several countries if they are likely to have

a "discernible adverse impact" and if they are "likely to compete with each other and

with domestic like products in the [U.S.] market."  <u>See</u> 19 U.S.C. § 1675a(a)(7).  The

language is unambiguous: though the cumulation requirements may be met, the

Commission may nevertheless decline to cumulate as a proper exercise of its power of

agency discretion.  See 19 U.S.C. § 1675a(a)(7) ("the Commission <u>may</u> cumulatively

assess . . ."); SAA at 887 ("[n]ew section 752(a)(7) grants the Commission <u>discretion</u> to

engage in a cumulative analysis" in sunset reviews) (emphasis added); <u>see also</u> <u>Ugine-

Savoie Imphy v. United States</u>, 26 CIT 851, 852, 248 F. Supp. 2d 1208, 1210-11 (2002)

("While the above limitations prevent cumulation in certain circumstances, in all other

instances cumulation is discretionary, not mandatory.").

        Notwithstanding the ITC's considerable discretion with respect to cumulation in

the first instance, the statutes' "no discernible adverse impact" element serves as an

"express limitation on [its] discretion to cumulate." <u>Neenah Foundry Co.</u>, 25 CIT at 705,

155 F. Supp.2d at 769.  Logically, however, this express limitation applies only if the

Commission decides to exercise its discretion to cumulate the relevant subject countries

in the first instance.  See 19 U.S.C. § 1675a(a)(7) ("[t]he Commission shall not . . .").

Therefore, if the ITC declines to cumulate—as it declined to cumulate Canada with the

other subject countries and declined to cumulate Australia, France, Japan, Germany,

and Korea all together—then this statutory prohibition does not come into play.  <u>Cf.</u>

<u>Chefline Corp. v. United States</u>, 26 CIT 878, 880, 219 F. Supp.2d 1303, 1306 (2002)

(upholding ITC's determination not to consider all the statutory factors where a single

factor was dispositive of cumulation); <u>see also</u> <u>U.S. Steel Group</u>, 96 F.3d at 1362 ("So

long as the Commission's analysis does not violate any statute and is not otherwise

arbitrary and capricious, the Commission may perform its duties in the way it believes

most suitable.").

Individual Commissioners, therefore, are not required to apply identical

analytical methodologies when the statute requires no such result.[19]  See U.S. Steel

Group v. United States, 96 F.3d 1352, 1362 (Fed. Cir. 1996) ("So long as the

Commission's analysis does not violate any statute and is not otherwise arbitrary and

capricious, the Commission may perform its duties in the way it believes most

suitable.").  On this record the Court is satisfied that Chairman Pearson and

Commissioner Okun performed their duty, properly exercised their discretion, and

conducted the statutory cumulation analysis as required by law.  See Nucor

---

[19]The cases cited by Plaintiffs for the proposition that there is a requirement that
the ITC must first consider certain factors in the cumulation statute in order, are
inapposite.  (USS Br. at 16-17.)  Angus Chemical Co. v. United States, 140 F.3d 1478
(Fed. Cir. 1998), cited by USS, deals with a different statute and different statutory
language.  In Angus Chemical the statute involved includes the mandatory language
"shall consider . . . in each case."  Id. at 1483.  By contrast, this language is not part of the
instant cumulation statute.  Again, section 1675a(a)(7) is imbued with the language of
discretion.  Joint Plaintiffs cite to Massachusetts v. EPA, a case about the text of the
Clean Air Act concerning whether an agency must exercise its discretion within the
defined statutory limits.  Massachusetts v. EPA, 549 U.S. 497, 127 S. Ct. 1438 (2007).  (See
Joint Pl.'s Br. at 19-22).  Unlike the "wide latitude" delegated by Congress to the ITC
regarding cumulation in sunset reviews, the statute under review in Massachusetts,
regarding the EPA's scope of authority to render "scientific judgment[s]" on air
pollutants, is markedly more narrow.  Cf. Allegheny Ludlum Corp., 475 F. Supp.2d at
1380 with Massachusetts, 127 S. Ct. at 1463.  Thus, the analysis in Massachusetts is
inapposite.

Corporation v. United States, 32 CIT __, __, 569 F. Supp. 2d 1328, 1340 n.4 (2008) ("This

analysis is [in] accordance with law.  Nothing in the cumulation provision requires the

ITC to consider any factors, but only prohibits cumulation if these threshold

requirements are not met.") (citing 19 U.S.C. § 1675a(a)(7)); see also 2007 Commission

Views at 107 n.612 (C.R. 831).

Because the Commission's interpretation and application of the no discernible

adverse impact standard is supported by substantial evidence and is in accordance with

the law, this exception to cumulation under 19 U.S.C. § 1675a(a)(7) does not apply.

2.        Likelihood of a Reasonable Overlap of Competition

Following a determination that the "no discernible adverse impact" exception is

inapplicable, the ITC must then conduct a "reasonable overlap of competition" analysis.

See 19 U.S.C. § 1675a(a)(7).  "[T]o support cumulation, the ITC must find a reasonable

overlap of competition between imports from the subject countries and the domestic

like product."  Noviant OY v. United States, 30 CIT __, __, 451 F. Supp. 2d 1367, 1379

(2006) (citations and quotes omitted).  Only a "reasonable overlap" of competition is

necessary.  See Wieland Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp. 50, 52

(1989); Granges Metallverken AB v. United States, 13 CIT 471, 477, 716 F. Supp. 17, 22

(1989) ("[T]he Commission need only find evidence of reasonable overlap in

competition to support its determination to cumulate imports.").  On this sunset review

record, the ITC concluded that "[o]n balance . . . there will likely be a reasonable overlap

of competition between subject imports from each country and the domestic like

product as well as among subject imports from each country should the orders be

revoked."  2007 Commission Views at 113 (C.R. 831).

Traditionally, the Commission has considered this statutory element by reference

to a "four factor" test—(1) fungibility; (2) sales or offers in the same geographic markets;

(3) common or similar channels of distribution; and (4) simultaneous presence.  See 2007

Commission Views at 21 n.60, 112 n.648 (C.R. 831).[20]  During its five-year reviews, the

Commission's "relevant inquiry is whether there likely would be a reasonable overlap

of competition even if none currently exists because the subject imports are absent from

the U.S. market."  Id. at 112.  However, neither this test nor the "traditional" four factors

test are singularly dispositive or the sole factors the ITC may consider.[21]  See Allegheny

Ludlum, 475 F. Supp. 2d at 1377-81; Neenah Foundry Co., 25 CIT 702.  The ITC noted in

---

[20]Citing Certain Cast-Iron Pipe Fittings from Brazil, the Republic of Korea, and
Taiwan, Inv. Nos. 731-TA-278-280 (Final), USITC Pub. 1845 (May 1986), aff'd Fundicao
Tupy, S.A. v. United States, 678 F. Supp. 898 (Ct. Int'l Trade 1988), aff'd 859 F.2d 915
(Fed. Cir. 1988); Mukand Ltd. v. United States, 937 F. Supp. 910, 915 (Ct. Int'l Trade
1996)).

[21]Indeed the ITC argues that its "four factor test is not specified in the statute"
nor is it dispositive of whether the imports are likely to compete with one another or
whether the ITC should exercise its discretion to cumulate, contrary to Joint Plaintiffs'
and USS's contentions.  (ITC Resp. Br. at 18-19.)

its determination that as part of its cumulation analysis it "generally has considered

[that the] four factors provide a framework for determining whether the imports

compete with each other and with the domestic like product."  2007 Commission Views

at 21 n.60 (C.R. 831).  However, the Commission also considers "other significant

conditions of competition that are likely to prevail if the orders under review are

terminated."  2007 Commission Views at 21 (C.R. 831).

In this determination[22] the ITC relied on evidence showing that domestically

produced and imported CoRe steel "are fungible products" since they "share the same

essential chemical and physical properties" and there is a "moderate to high degree of

substitution between them."  2007 Commission Views at 112 (C.R. 831) (citing CORE-II-

21, -30).  Moreover, "producers, importers, and purchasers reported that [CoRe]

steel . . . is always or frequently interchangeable . . . as long as the steel conforms to the

purchaser's specifications or the supplier has been approved."  Id. (citing CORE-II-21).

"[T]he types of [CoRe] steel that the subject producers either exported to the United

States or produced during the review period reveal a sufficient degree of fungibility

among the subject imports and with the domestic product."  Id.  Additionally, the ITC

determined that there is "reasonable" or "sufficient" overlap with respect to the types of

---

[22]During the original investigation and the first sunset review, the majority of
commissioners on the ITC voted to cumulate subject imports from all subject countries
"based on a reasonable overlap of competition."  2007 Commission Views at 112 (C.R.
831).

CoRe steel products produced by the subject countries and exported to the U.S., as well

as with their channels of distribution.  Id. at 113 (C.R. 831).

Finally, with respect to simultaneous presence, the ITC found that "imports from

each of the subject countries have been present in the U.S. market during at least some

portion" of the POR.  Id.  The ITC then concluded that should the ADD/CVD orders be

revoked, "there will likely be a reasonable overlap of competition" between CoRe steel

from the subject countries and the domestic like product.  Id.  Based on the foregoing

analysis, this Court finds the Commission's findings in this regard are "consistent with

the view that the ITC can exercise discretion in assessing the factors germane to the

analysis."  Copperweld Corp. v. United States, 12 CIT 148, 161, 682 F. Supp. 552, 566

(1988).

Regarding Joint Plaintiffs' and USS's arguments that Chairman Pearson's and

Commissioner Okun's cumulation analysis is erroneous since they conducted neither a

"likelihood of competition" nor "discernible adverse impact" analysis, this Court agrees

with the ITC that such arguments are "flawed."  (ITC Resp. Br. at 19.)  Both Chairman

Pearson and Commissioner Okun clearly joined Vice Chairman Aranoff's and

Commissioner Hillman's discussion of no discernible adverse impact, reasonable

overlap of competition, and other conditions of competition.  See 2007 Commission

Views at 107 n.612 (C.R. 831).  Moreover, as the ITC points out, Chairman Pearson and

Commissioner Okun considered all the statutory factors but merely considered them in

a different order than the other commissioners.[23]  (ITC Resp. Br. at 19-20.)  This Court

agrees.

The Court also rejects Joint Plaintiffs' and USS's arguments that the ITC's

conditions of competition analysis was not "counterfactual" due to its use of existing

conditions of competition for the subject imports.  Joint Plaintiffs and USS complain that

the ITC erred when it based this analysis on the market conditions when the orders

were in place (as opposed to beforehand) and "unlawfully failed to evaluate the likely

behavior of imports if the orders were revoked."  (Joint Pl.'s Br. at 24-25; see also USS

Br. at 19-20.)  The ITC, Joint Plaintiffs allege, "erroneously relied upon the subject

producers' behavior during the period of [the second] review while the discipline of the

orders was in place."  (Joint Pl.'s Br. at 25.)

This Court finds in the record that the Commission assessed both current and

likely conditions to determine whether imports from the several countries would likely

compete under different conditions of competition upon revocation.  See 2007

Commission Views at 8-9, 114 (C.R. 831); see also SAA at 884 (The ITC may consider

"relevant factors such as current . . . shipment levels and . . . prices" in its sunset

_____

[23]With Canada, Chairman Pearson and Commissioner Okun decided on the
grounds of "administrative economy" to not analyze the "no discernible adverse
impact" factor since they had already declined to exercise their discretion to cumulate
subject imports from that country.  (ITC Resp. Br. 20.)

analysis.)

USS argued that the ITC "paid no attention to what occurred during the period of the original investigation" prior to the ADD and CVD orders.  (USS Br. at 19.) Relying on legislative history, Joint Plaintiffs and USS argue that a lawful analysis by the ITC should have considered data on import behavior from the original investigation (prior to when the orders were instituted) in order to assess the likely import volume from the subject countries if the orders were revoked.  (Joint Pl.'s Br. at 24-25; USS Br. at 19-20.)  This is simply not true.  The Court rejects this argument because the ITC clearly cited to specific evidence in the administrative record where it discussed evidence from its cumulation findings in the original CoRe investigations and the first reviews.  See 2007 Commission Views at 108-112, nn.624, 627, 636, 639, and 645. (C.R. 831).  Moreover the Commission specifically noted that the statute "directs [it] to take into account its prior injury determinations."  2007 Commission Views at 23 (C.R. 831).  In any case, findings and evidence from prior periods are not dispositive of the Commission's cumulation analysis.  See Neenah Foundry Co., 25 CIT at 709; Usinor, 28 CIT at 1135 ("there is limited precedential value to previous reviews because the Commission is not required to make identical determinations in each, and it must consider each subject import and the circumstances of each investigation sui generis").  Case in point, the ITC noted that certain significant changes had taken place during this second review that

distinguished it from similarities that existed in the conditions of competition from the

first review.  See ITC Resp. Br. at 22-23.  Given the developments that transpired

between the first and second reviews, it was reasonable for the ITC to decide not to

follow its cumulation decision from the first POR.  See Usinor, 28 CIT at 1135.

Accordingly, this Court holds that there is substantial evidence in the record to

support the ITC's finding of a reasonable overlap in competition among the subject

imports, and such determination is otherwise in accordance with law.

3.     Other Considerations ~ The "Conditions Of Competition"

Having met the statutory elements for cumulation, the Commission went a step

further and considered some additional factors in order to assess whether "other

significant conditions of competition . . . are likely to prevail if the orders under review

are terminated."  2007 Commission Views at 21, 113-119 (C.R. 831).  The Commission

explained that these other significant "conditions of competition" would indicate

whether or not it should exercise its discretion to cumulate certain countries together.

See id. at 113.  These "other factors" included the "likely differing conditions of

competition for the subject imports, likely differences in price or volume trends, or

transnational ownership of facilities producing the subject product."  Id.

Joint Plaintiffs and USS challenged these "other considerations" and argue that

the ITC erred in its findings and, instead, should have cumulated the subject imports all

together.  (Joint Pl.'s Br. at 17-38; USS Br. at 10-25.)  They challenge the ITC's

determination here on two broad fronts, first, that the Commission applied an

"incorrect" conditions of competition analysis in contravention of the statute (see Joint

Pl.'s Br. at 22-26; USS Br. at 12-25) and second, the Commission's determination was not

supported by substantial evidence (Joint Pl.'s Br. at 26-38; USS Br. at 10-25.)

> *a.  The ITC's conditions of competition analysis was proper.*

Joint Plaintiffs' and USS's first point is that it was wrong for the ITC to consider

the "extra-statutory analysis of 'conditions of competition' without consideration" of

the elements of section 1675a(a)(7).  Joint Plaintiffs' and USS's arguments appear to

center on the ITC's alleged failure to focus on the existence of differing conditions of

competition, rather than the Commission's traditional four-factor test.  (Joint Pl.'s Br. at

19-22; USS Br. at 12-18; see also ITC Resp. Br. at 18.)  The Court finds these arguments

unavailing.

The cumulation statute does not require that the Commission consider any

particular factors (i.e., the "four factor" test) in determining whether it will exercise its

discretion to cumulate.  See 19 U.S.C. § 1675a(a)(7); Allegheny Ludlum Corp., 475 F.

Supp.2d at 1377-78, 1379-81 (The ITC "has wide latitude in selecting the types of factors

it considers relevant" in its cumulation analysis.).  Moreover, precedent affirms that the

ITC "has wide latitude in selecting the types of factors it considers relevant in

undertaking its cumulation analysis."  Id. at 1380; see Neenah Foundry Co., 25 CIT at

709 (individual sunset review determinations do not bind ITC to use those same factors

in other determinations).

Both Joint Plaintiffs and USS also contend that the ITC's conditions of

competition analysis violated the "language and spirit of the relevant statute and

regulations."  (USS Br. at 12; see also Joint Pl.'s Br. at 22-24.)  Citing both to the

legislative history of the mandatory cumulation statute for ITC investigations (which is

not at issue in this lawsuit) and the discretionary sunset review cumulation statute,

Joint Plaintiffs and USS seek to impress upon the court Congress's regard for

cumulation as a "critical component of the antidumping and countervailing duty law."

(USS Br. at 13 (citing S.A.A., H. Rep. No. 103-316 at 847 (1994), reprinted in 1994

U.S.C.A.A.N. 4040, 4181).)  Indeed, in devising the cumulation statutes, Congress

endeavored to ensure that the domestic industry could not be harmed by a "hammering

effect" of unfairly traded imports from multiple countries—a consequence that could

arise where subject imports are reviewed on a country-by-country basis.  See Cogne

Acciai Speciali S.P.A. v. United States, 29 CIT 1168,1171-72 (2005).

Joint Plaintiffs and USS argue that the cumulation analyses (or lack thereof)

conducted by Chairman Pearson and Commissioner Okun undermine this

Congressional intent vis-à-vis the "hammering effect."  (USS Br. at 14-15; Joint Pl.'s Br.

at 19-22.)  This argument too, is unpersuasive.  Chairman Pearson and Commissioner

Okun explicitly state in their determination that they join the discussion of their

colleagues in the majority—Vice Chairman Aranoff and Commissioner Hillman—and

reach the same conclusion.  2007 Commission Views at 107 n.612 (C.R. 831).  Chairman

Pearson and Commissioner Okun need state no more.  Neither is there a statutory

command that the ITC respond to every piece of evidence presented, <u>Granges</u>

<u>Metallverken AB</u>, 716 F. Supp. at 24, nor a rule that the ITC proscribe to a particular

cumulation methodology, <u>see</u> <u>Allegheny Ludlum Corp.</u>, 475 F. Supp.2d at 1378, 1379-81.

More to the point, this Court cannot void the ITC's exercise of discretion based on an

alleged failure to explain a piece of evidence, especially where the challenged point is

clearly part of the record.  <u>Compare</u> USS Br. 13-15 <u>with</u> 2007 Commission Views at 107

n.612 <u>and</u> 112 n.647 (C.R. 831).  Chairman Pearson and Commissioner Okun therefore

are presumed to have considered these points.[24]

    Moreover, Joint Plaintiffs' argument is based on what it characterizes as

---

[24]

> While it is an abuse of discretion for an agency to fail to
> consider an issue properly raised by the record evidence, the
> fact that certain information is not discussed in a Commission
> determination does not establish that the Commission failed to
> consider that information because there is no statutory
> requirement that the Commission respond to each piece of
> evidence presented by the parties.

<u>Granges Metallverken AB</u>, 716 F. Supp. at 24 (citations omitted).

precedent: the ITC "correctly employed the 'conditions of competition' analysis in the

first sunset review," which by statute, they argue, requires the Commission to consider

the "conditions of competition impacting the domestic industry—not the conditions

affecting foreign producers."  (Joint Pl.'s Br. at 22 (citing 19 U.S.C. §§ 1675a(a)(4) and

1677(7)(C)(iii)) (emphasis added).)  Joint Plaintiffs maintain that the Commission

"departed" from the analysis conducted in the first review without explanation and is

therefore arbitrary and ultra vires of the statute.  (Id. at 23 n.5 (citing Citrosuco Paulista,

S.A. v. United States, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1998) ("an agency must

either conform itself to its prior decisions or explain the reasons for its departure")).)

This argument is unavailing.

First, the ITC did take the cumulation findings from the original investigation

and first sunset review into consideration.  (ITC Resp. Br. at 22; 2007 Commission Views

at 23, 108-112 nn.622, 624, 627, 636, 639 & 645 (C.R. 831).)

Second, this Court does not find that the ITC has established an agency practice

from which it has deviated.  Precedent instructs that an agency practice is established

when a uniform procedure exists that would lead a party to reasonably expect that the

agency would adhere to the procedure.  See Ranchers-Cattlemen Action Legal Found. v.

United States, 23 CIT 861, 884-85, 74 F. Supp. 2d 1353, 1374 (1999).  The Court is not

convinced that a uniform "conditions of competition" practice was established simply

by the first review.  Additionally, the ITC's conditions of competition analysis has

previously been met with approval by this Court.  <u>See, e.g.</u> <u>Allegheny Ludlum Corp.</u>,

475 F. Supp.2d at 1377-78.

Third, the ITC is not bound by prior determinations if new arguments or facts

support an alternative conclusion.  <u>See</u> <u>Citrosuco Paulista</u>, 12 CIT at 1209.  Indeed, "a

particular circumstance in a prior investigation cannot be regarded by the Commission

as dispositive of the determination in a later investigation."  <u>USEC, Inc. v. United States</u>,

25 CIT 49, 64, 132 F. Supp. 2d 1, 14 (2001).  The record here demonstrates that the

economic facts and market conditions established during the second POR are vastly

different from those of the first POR.

Finally, the ITC's "conditions of competition" analysis is not <u>ultra vires</u> of the

cumulation statute.  Joint Plaintiffs incorrectly ascribe as binding authority, the

irrelevant statutes concerning the likely impact of the subject imports on the domestic

industry (<u>see</u> 19 U.S.C. §§ 1675a(a)(4) and 1677(7)(C)(iii)) instead of the relevant

cumulation statute (19 U.S.C. § 1675a(a)(7)) under analysis here.

> *b.  Joint Plaintiffs and USS have failed to establish that the ITC's exercise*
> *of discretion was clearly erroneous.*

Joint Plaintiffs and USS contend is that the ITC must analyze the "likely" effects

on the domestic industry, in the reasonably foreseeable future, should the ADD/CVD

orders be revoked.  (<u>Id.</u>)  Premised on a reading of the legislative history interpreting

the "likelihood standard," they argue that the ITC is supposed to analyze a hypothetical

domestic market upon revocation of an ADD/CVD order prospectively and not as it

exists presently.  Id. ("[U]nder the likelihood standard, the Commission will engage in a

counter factual analysis: it must decide the likely impact in the reasonably foreseeable

future of an important change in the status quo—the revocation or termination of a

proceeding and the elimination of its restraining effects on volumes and prices of

imports.").  See also SAA at 883-884.  On this basis, USS calls upon this Court to reject

the ITC's analysis because it "erroneously relied upon the subject producers' behavior

during the period of review while the discipline of the orders was in place."  (USS Br. at

25.)  The ITC should have looked to pre-order data (i.e. data from the CoRe steel market

prior to 1993), Joint Plaintiffs and USS argue, which is the most recent period where the

subject imports competed with the domestic products without the "discipline" of the

ADD/CVD orders.  (Id.)

    While Plaintiffs are correct that the ADD/CVD statutes require the ITC to

consider its prior injury determinations during a sunset review, such findings from the

original investigation are not themselves dispositive.  See Timkin Co. v. United States,

27 CIT 605, 612, 264 F. Supp.2d 1264, 1274 (2003) (citing SAA at 886).  A review of the

record demonstrates that the ITC did in fact examine the past, current, and likely

market conditions.  See, e.g. 2007 Commission Views at 23, 108-112 nn. 622, 624, 627,

636, 639 & 645, 120-149 (C.R. 831).  Moreover, the ITC is permitted to consider current

conditions as part of its analysis.  <u>See</u> SAA at 884 (ITC may consider "relevant factors

such as <u>current</u> . . . depressed shipment levels and . . . prices" in its sunset analysis.).  It

is, therefore, this Court's determination that Plaintiffs have not established that the

ITC's exercise of discretion was clearly erroneous.  <u>See</u> <u>Overton Park</u>, 401 U.S. at 416.

Joint Plaintiffs and USS also allege errors in the ITC's cumulation analysis

claiming it was "inconsistent."  (Joint Pl.'s Br. at 27-28, 35.)  This court disagrees,

however.  The ITC responds, and this Court agrees, that though the four-factor test

indicated to the ITC that the subject producer's CoRe steel was fungible, shipped to

substantially similar end users, and exhibited simultaneous presence and geographic

overlap during the POR, the evidence pertaining to the other conditions "told the

Commission that certain countries did not have an interest in supplying the U.S. market

for the reasonably foreseeable future, while other countries did."  (ITC Resp. Br. at 28-29

(<u>citing</u> 2007 Commission Views at 112-13, 117-19 (C.R. 831).)  The ITC reasonably

focused its analysis on the incentives that the subject CoRe producers had to export to

the U.S. market in the reasonably foreseeable future.  <u>Usinor Industeel, S.A.</u>, 26 CIT at

1409-11.  This Court finds that it was reasonable for the ITC to consider import data on

the levels of CoRe from the subject countries in order to deduce which countries would

likely be interested in the U.S. market for a significant share of their exports.  2007

Commission Views at 112-113 (C.R. 831).

The Court also rejects Joint Plaintiffs' and UCC's argument that the French and

Japanese producers' affiliations with U.S. producers does not support a finding of no

interest in the U.S. market.  (Joint Pl.'s Br. at 35-36; USS Br. at 23-25.)  The record

supports the ITC's contention that during the second review, the multinational

affiliations were part of a growing domestic and global trend toward mergers among

CoRe steel producers, which in turn enable the producers to better serve their

customers' interests in sourcing CoRe steel from sources locally and regionally.  2007

Commission Views at 119, 122, 123, 126, 132 n.814 (C.R. 831).  Unlike the first POR

where the Asian financial crisis had plagued the worldwide market, severely limiting

demand for CoRe, the Asian market had recovered by the second POR.  This difference

was significant for the ITC.  Id.  In sum, Joint Plaintiffs and USS have failed to show that

the ITC unreasonably exercised its discretion to cumulate subject imports.  Therefore,

having found that there is a "reasonable overlap" of competition among the CoRe steel

imports and domestic product, the ITC's decision to cumulate in groups is consistent

with the statute, precedent, and is therefore in accordance with law.  19 U.S.C. §

1675a(a)(7); see Weiland Werke, AG, 13 CIT at 563.

> *c.  The ITC's cumulation determination was supported by substantial evidence*

Joint Plaintiffs/USS/German Plaintiffs also attack the Commission's

determination arguing that it was not supported by substantial evidence.  (Joint Pl.'s Br.

at 26-38; USS Br. at 18-25; German Pl's Br. at 9-32.)[25]  The ITC in response suggests that

Plaintiffs' protests "merely reflect disagreements with how the Commission weighed

the evidence."  (ITC Resp. Br. at 25.)

    In reviewing the record, this Court finds the Commission's cumulation

determination was amply based on substantial evidence.  The ITC predicated its

determination on "significant differences between the three groups of countries that

were considered separately and important similarities among the countries that were

cumulated."  (Id.)  The ITC found that CoRe steel imports from these three countries

had dropped to "very low levels" since the initial investigation period.  Id.  For

example, from 2000 to 2005, CoRe steel imports dropped 92.6% from Australia, 50.7%

from France, and 39.1% from Japan.  (ITC Resp. Br. at 25 (referencing 2007 Sunset

Review Information at Table C-7 (P.R. 941)).)  Instead, the subject producers were

_____

[25]"A party challenging the Commission's determination under the substantial
evidence standard 'has chosen a course with a high barrier to reversal.'" Nippon Steel
Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quoting Mitsubishi Heavy
Indus., Ltd. v. United States, 275 F.3d 1056, 1060 (Fed. Cir. 2001)).  This Court "must
affirm a Commission determination if it is reasonable and supported by the record as a
whole, even if some evidence detracts from the Commission's conclusion." Altx, Inc. v.
United States, 370 F.3d 1108, 1121 (Fed. Cir. 2004).  In short, "we do not make the
determination; we merely vet" it. Nippon Steel Corp., 458 F.3d at 1352.

significantly focused on their own home and regional markets.[26]   2007 Commission

Views at 119 (C.R. 831).   Additionally, the ITC determined that French and Japanese

subject producers were "affiliated with major U.S. producers," which they conclude

made it "more likely that they would supply the U.S. market from their affiliates' U.S.

production."   Id. at 117-119.   Such evidence allowed the ITC to conclude that subject

imports from Australia, France and Japan should be considered on a cumulated basis.

Id. at 119.

        With respect to Germany and Korea, the ITC found that, unlike Australia, France

and Japan, CoRe steel from both countries had "an increasing presence in the U.S.

market" during the POR.   Id. at 116.   The ITC noted that subject imports from Korea

rose to substantially higher rates towards the end of the second POR, and were higher

than the highest level achieved during the original investigation of 193,513 short tons.

Id. (citing Table CORE-I-1.)   CoRe steel imports from Germany were also noticeably

higher in 2005 than at any time during either the first or second POR, though lower than

in the original investigation.   Id.   German producers also exhibited an interest in the

---

[26]The Commission majority found that with respect to Australia, a large
percentage of its CoRe steel shipments, [[    ]]% in 2005, have been to its home market
with Asia following close behind.  With regard to Japan, approximately [[    ]]% of its
CoRe shipments have consistently been to its home market throughout the POR.
Finally, French subject producers shipped the vast percentages of its CoRe steel to either
its home market, [[    ]]%, or to the European Union [[    ]]% during the POR.  2007
Commission Views at 119 nn. 702, 703, 704, 705 (C.R. 831).

North American market as evidenced by their shipments of non-subject micro-alloy

CoRe steel, which [[                                                   ]] during the entire

POR, suggesting by itself an interest in having a "substantial presence" in the U.S.

market.  Id. at 116 n.680 (citing Table CORE-IV-43).  The ITC also determined that

coupled with an interest in the North American market, German and Korean CoRe

suppliers did not have "sufficient presence to supply the U.S. market" from within the

U.S. or regionally.[27]  Id.  ThyssenKrupp, which does not have a U.S. production affiliate,

the ITC noted, made up [[    ]]% of German production and [[              ]] German

exports of CoRe imports to the U.S. since 2000."  Id. at 117 n.684.  Moreover, neither

Salzgitter nor Corus, which comprise [[      ]]% of German production, have a U.S.

production facility.  Id. at 117 n.686 (citing Table CORE-IV-35).  The ITC found these

characteristics contrasted sharply with the French and Japanese producers, who also

exhibited some interest in the U.S. markets, but unlike them, the German and Korean

producers could not exercise that interest through domestic affiliates.  More to the

point, the ITC notes that though Korean producer POSCO indicated plans to build a

production facility in Mexico and ThyssenKrupp expressed a desire to establish a North

---

[27]The ITC noted that although Korean producer POSCO has a 50% ownership stake in U.S. producer USS-POSCO, and though POSCO and its related Korean producer Pohang Coated Steel Co., Ltd. comprised [[    ]]% of production in 2005, USS-POSCO made up only [[    ]]% of 2005 production in the U.S.  2007 Commission Views at 116-17 (C.R. 831) (citing Table CORE-I-12).

American production facility, "the record does not indicate that it is more likely than

not that this will happen in the reasonably foreseeable future." Id. at 118 nn. 694, 695,

696. Evidence of this sort led the ITC to conclude that, despite some natural and

expected differences between German and Korean producers, the significant similarities

warranted cumulating them together, but separately from the other subject countries.

Id.

        With Canada, the ITC determined that Canadian subject producers faced unique

conditions of competition as compared to all the other subject producers warranting its

separate consideration from the other cumulated nations. Dofasco, the [[            ]]

exporter from Canada shipped approximately [[    ]]% of its CoRe steel exports to the

U.S., during the POR, to the automotive sector. Id. at 114 n.663. The automotive sector

"dominated" the U.S. market accounting for 47.6% of U.S. market shipments in 2005.

Id. at 114 n.664. Indeed, auto producers and parts suppliers "perceive" the U.S. and

Canada "as a unified market for production and sourcing decisions." Id. at 114 n.665.

Consequently, steel mills located in Canada and the U.S. "are significantly better

positioned than the other subject country producers to economically satisfy the just-in-

time delivery requirements" of the auto industry. Id. The ITC found that, in part due

to these unique circumstances, Canada is a "net importer" of CoRe steel, globally and

vis-à-vis the U.S.  As a net importer[28] during the POR, U.S. exports to Canada exceeded

imports from Canada.  <u>Id.</u> at 114-15 n.668.  The ITC found that this "two-way nature of

the market" corroborated the Canadian respondents' arguments that the auto producers

conduct their business as if there is "an integrated North American market."  <u>Id.</u> at 115.

Despite evidence that Dofasco, representing [[       ]]% of total Canadian production,

increased its exports to the U.S. during the POR, the ITC found that they were present

as a result of other factors [[




]], and not "due to price competition

with U.S. suppliers."  <u>Id.</u> at 115 (<u>citing</u> CORE-IV-29).  The ITC concluded that

> [t]he way in which shipments from Canada compete in the U.S.
> market distinguishes them from other subject imports . . . .
> [and though] . . . there is and will be some price competition
> between Canadian and U.S. producers, Canadian producers do
> not compete for sales in much of the market, and their
> dedicated sales into the auto segment are generally based more
> on demand for a specific auto part than on price.

<u>Id.</u>  Such evidence, "[o]n balance," led the ITC to conclude that the conditions of

competition faced by Canadian subject imports are "sufficiently different" as to provide

---

[28]Except for 2003.

a "reasonable basis" to not exercise its discretion to cumulate subject imports with those

of the other subject countries.  Id. at 116.

It seems to the Court that Joint Plaintiffs/USS/German Plaintiffs clearly take pains

to point out instances in the ITC's determination where, they argue, the Commission

drew an incorrect conclusion regarding its cumulation decision.  (Joint Pl.'s Br. at 26-38;

USS Br. at 18-25; German Pl's Br. at 9-32.)  This Court finds these arguments are more

accurately described as challenges to the weight of the evidence as ascribed by the ITC

in its sunset review findings.  It is well-established that it is an agency's domain to

weigh the evidence; therefore this Court must not upset the ITC's reasonable

conclusions supported by substantial evidence and replace them with conclusions

preferred by the Plaintiffs.  See Torrington Co. v. United States, 16 CIT 220, 225, 790 F.

Supp. 1161, 1169 (1992), aff'd, 991 F.2d 809 (Fed. Cir. 1993); see also Timkin Co. v.

United States, 27 CIT 605, 616, 264 F. Supp.2d 1264, 1274-75 (2003); Mukand Ltd. v.

United States, 20 CIT 903, 906, 937 F. Supp. 910, 914 (1996) ("[T]he Commission, as the

trier of fact, has considerable discretion in weighing the probative value and relevance

of evidence.").

Moreover, this Court also rejects the species of argument that claim the ITC

"failed to consider" certain evidence with regard to making its cumulation

determination.  In practically each instance, contrary to Joint Plaintiffs' and USS's

assertions, the Commission explicitly considered each point contested by Joint

Plaintiffs/USS/German Plaintiffs.  For example, Joint Plaintiffs and USS argue that the

ITC failed to consider the excess capacity for each country in its cumulation analysis.

See 2007 Commission Views at 109-111 (C.R. 831).  The Court, however, finds

reasonable, the Commission's conclusion that although the excess capacity among the

subject countries might have favored cumulation, on balance, important differences in

other conditions of competition warranted not cumulating subject imports from

Australia, France and Japan with subject imports from Germany and Korea.  Id.

Finally, the Court rejects Joint Plaintiffs' and USS's argument that the ITC

allegedly failed to consider that Australia, France, Japan, Germany and Korea all

shipped similar proportions of their total shipments to their home markets and thus

were similarly export oriented.  (Joint Pl.'s Br. at 37; USS Br. at 21-22.)  The ITC argues

that the Joint Plaintiffs and USS merely are seeking to re-weigh evidence in their favor

and this Court agrees.  The ITC contends, and this Court agrees, that not only did the

Commission consider the export orientation of the subject countries (or lack thereof),

but it also found other factors—such as interest in the U.S. market, growth in exports to

the U.S., Canada, and Mexico, and lack of affiliation with important U.S.

producers—were apparently significant enough to warrant not cumulating the subject

imports from all five countries.  See 2007 Commission Views at 118-119 (C.R. 831).

Of Joint Plaintiffs', USS's, and German Plaintiffs' arguments in opposition to the

cumulation determination, it is not the role of this Court to substitute its judgment for

that of the agency considering the agency's analysis was undertaken in accordance with

the plain language of the statute and adequately supported by the facts in the record.

See Universal Camera Corp., 340 U.S. at 488.  Therefore, this Court holds that the ITC's

exercising of its discretion to cumulate the subject imports into separate groups—(1)

Australia, France and Japan; (2) Germany and Korea; and (3) to not cumulate

Canada—is supported by substantial evidence and is in accordance with law.

**II.    The ITC's Final Negative Determination, With Respect to Australia, France,
        Japan, & Canada, and Its Final Affirmative Determination, With Respect to
        Germany & Korea Is Supported by Substantial Evidence on the Record and Is
        Otherwise in Accordance With Law**

Having found that the ITC's cumulation decision is supported by substantial

evidence on the record, the Court will now discuss the ITC's finding that revocation of

the antidumping and countervailing duty orders are not likely to lead to a continuation

or recurrence of material injury to the domestic CoRe steel industry within a reasonably

foreseeable period of time.

**A.    Statutory Framework**

In the course of a five-year review, the ITC will revoke an antidumping duty or

countervailing duty order unless it determines that such revocation is likely to lead to a:

(1) continuance or recurrence of dumping; and (2) continuation or recurrence of

material injury within a reasonably foreseeable period of time.  See 19 U.S.C. §

1675(d)(2)(A) & (B) (2000).  In order to conduct this evaluation, the ITC must consider

whether the "likely volume, price effect, and impact of imports of the subject

merchandise on the industry" will be "significant" upon the revocation of the

ADD/CVD order.  19 U.S.C. § 1675a(a) (1)–(4) (2000).  In this context, "likely" means

"probable"[29] and "significant" means "important, weighty, [or] notable."[30]

### B.     Likely Volume

We now turn to the ITC's volume analysis.  In evaluating the likely volume of

imports upon the revocation of an ADD/CVD order, the ITC must consider "whether

the likely volume of imports of the subject merchandise would be significant . . . either

in absolute terms or relative to production or consumption in the United States."  19

U.S.C. § 1675a(a)(2).  In conducting the volume analysis, the ITC shall

consider all relevant economic factors, including—

─────────────────────

[29]This Court has previously found that, in determining whether there is sufficient volume to constitute injury, the ITC must construe the word "likely" so that likely means probable. Usinor Industeel, S.A. v. United States, 26 CIT 467, 474 (2002) (noting that the common meaning of likely is probable); Nippon Steel Corp. v. United States, 26 CIT 1416, 1419 (2002) (finding that "likely means probable").

[30]Additionally, the term "significant" has been interpreted by this Court to mean "having or likely to have influence or effect[;] deserving to be considered [;] important, weighty, notable."  Gerald Metals, Inc. v. United States, 22 CIT 1009, 1013, 27 F. Supp.2d 1351, 1355 (1998) (alterations in original) (quoting WEBSTER'S 3D NEW INT'L DICTIONARY, 2116 (1993)).

> (A)     any likely increase in production capacity or existing unused production capacity in the exporting country,
>
> (B)     existing inventories of the subject merchandise, or likely increases in inventories,
>
> (C)     the existence of barriers to the importation of such merchandise into countries other than the United States, and
>
> (D)     the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products.

19 U.S.C. § 1675a(a)(2) (2000).  Therefore, "in order to find sufficient volume for there to be injury, the ITC must identify substantial evidence from the record demonstrating that, should the orders be revoked, it is likely that the volume of the subject imports entering the U.S. market will be significant."  Nippon Steel Corp. v. United States, 29 CIT 695, 712, 391 F. Supp. 2d 1258, 1275 (2005), rev'd on other grounds, 494 F.3d 1371 (2007).  Further, the ITC must consider whether the likely volume would be "significant" in absolute terms, or relative to production or consumption in the United States.  See 19 U.S.C. § 1677(7)(C)(I) (2000).

For the reasons set forth below, the Court finds that the Commission's findings relating to the volume of cumulated imports are supported by substantial evidence on the record and in accordance with law.

1.     Australia, France & Japan

The ITC found that in the absence of the ADD/CVD orders, the likely volume of

CoRe steel imports from Australia, France and Japan would not be significant; indeed

these countries "currently supply the least amount" of CoRe steel to the U.S. market.

2007 Commission Views at 9, 128-129 (C.R. 831).  In 2005, for example, cumulated CoRe

steel imports from these three countries were 18,556 short tons, or 0.1% of apparent U.S.

consumption and production.  Id. at 128.  At its highest level, during this POR, CoRe

steel imports from Australia, France and Japan accounted for 40,332 short tons in 2002,

or 0.2% of apparent U.S. consumption and production.  Id.

     The ITC also found that the CoRe steel producers from Australia, France and

Japan operated at "relatively high capacity utilization rates" and were focused

primarily on their home and regional markets.  Id. at 129.  In addition, quantities of

CoRe steel held in inventory "do not appear to represent significant volumes that could

be diverted readily to the U.S. market upon revocation of the orders."  Id.[31]  Moreover,

during the POR, producers from these countries were focused primarily on their home

and regional markets and have not demonstrated a particular interest in the North

American market.  Id.  The ITC concluded that the evidence showed that this trend does

not appear likely to change in the reasonably foreseeable future.  Id. (See Tables CORE-

---

[31]The ITC notes that there were "no reported inventories" in the U.S. from either
Australia or France during the POR and "inventories of Japanese product were only
[[   ]] short tons in 2005.  Additionally, the ITC also found that the CoRe steel held in
inventory by the cumulated subject countries was made to order and thus "already
committed to specific customers."  2007 Commission Views at 129 (C.R. 831).

IV-10, 12, 27, 28, 29, 45, 46 & 47.)

       *a.*    *Contentions*

     Joint Plaintiffs argue that the ITC's volume analysis is premised on a "mistaken

notion that 'other' factors will prevent subject imports from Australia, France, and

Japan from re-entering the market upon revocation" of the ADD/CVD orders.  (Joint

Pl.'s Br at 45.)  This "mistaken notion" of the ITC, they argue, is characterized by the

Commission's technique of "segregating the subject countries into groups and then

examining isolated record evidence . . . to justify its determination."  (Id.)  Joint

Plaintiffs attack the Commission's likely volume determination on three grounds.  First,

Joint Plaintiffs argue that the ITC "admits" that Australian, French and Japanese

producers have "significant excess capacity"[32]—[[     ]] million short tons in 2005.  (Id. at

46 (citing 2007 Commission Views at 129 (C.R. 831)).)  The ITC failed even to consider

"the magnitude of such a significant amount of excess capacity and the potential effects

an increase in volume of that size would have on the domestic industry."  (Id.)  The

combined excess capacity from this sunset review is [[                    ]] as the total

import volume from all subject countries (1.9 million short tons) at their peak in 1992

during the original investigation.  (Id.)  Moreover, Joint Plaintiffs argue, the ITC also

ignored evidence of a growing trend in the cumulative inventories of the subject

_____

    [32]Though, Joint Plaintiffs themselves admit that the ITC "never stated whether it considers this excess capacity to be significant of not."  (Joint Pl.'s Br. at 46.)

producers.  (Id. at 47-48.)  Additionally, Joint Plaintiffs argue that the ITC ignored the

"very real possibility that subject producers can shift significant amounts of production

from non-subject to subject merchandise."  (Id. at 48.)

Second, Joint Plaintiffs argue that the ITC's finding that CoRe steel producers

from Australia, France and Japan are not export-oriented and have little incentive to

ship outside their respective regions is not supported by substantial evidence.  (Id. at

49-61.)  Joint Plaintiffs contend that "[s]ubstantial evidence . . . does not exist that any of

these three countries was not likely to shift their exports to the United States upon

revocation."  (Id. at 49.)  Joint Plaintiffs proffer record evidence and note that "the rapid

expansion of Chinese CoRe production capacity presents a significant barrier to all

subject countries in the reasonably foreseeable future," and contend the ITC analyzes

this very large Asian consumer "half-heartedly."  (Id. at 50, 50–56.)  The fact is, Joint

Plaintiffs contend, "[t]he continued and growing capacity increases by the Chinese will

likely cause greater instability in the Asian CoRe steel markets.  [This causes greater]

competition, [which makes] these markets . . .less attractive to . . . [Australian, French

and Japanese producers], ultimately forcing them to find alternative export markets."

(Id. at 52.)  Joint Plaintiffs also challenge the ITC's finding, contrary to its findings in the

first sunset review, that certain mergers between French or Japanese CoRe producers

with U.S.-based affiliates remove the incentive to resume shipments to the U.S. since

any such domestic orders could be filled from the domestic U.S. affiliate.  (<u>Id.</u> at 57–61.)

Third, Joint Plaintiffs argue that the ITC failed to properly conduct a counterfactual analysis as mandated by the SAA and "merely pays lip service" to the post-revocation market conditions in the U.S.  (<u>Id.</u> at 61–62.)  Citing the relatively high ADD/CVD margins imposed on Australian, French and Japanese CoRe steel products, it was "no surprise" that CoRe steel from these three countries dramatically declined. (<u>Id.</u> at 62.)  The Commission ignored the SAA's presumption, they argue, that such a trend, highlighted above, means that the subject producers cannot trade fairly without the discipline of ADD/CVD orders.  (<u>Id.</u>)  Joint Plaintiffs conclude that the ITC's assertion that the subject countries no longer have an incentive to ship to the U.S. is not supported by record evidence.  (<u>Id</u>.)

Joint Plaintiffs and USS also argue that the ITC ignored the significance of the quantities of French and Japanese exports of CoRe steel to Canada and Mexico during the POR.  (Joint Pl.'s Br. at 55-56; USS. Br. at 34-35, 42.)

USS separately argues two major points.  One, that the ITC failed to conduct its likely volume analysis on a cumulated basis, as required once it decided to cumulate Australia, France and Japan together, and instead made separate findings.  (USS Br. at 25-28.)  USS suggests that the ITC "failed to meet [its] responsibility" and "explain[ed] away" its country-specific discussions when it "included some discussion of each of the

countries individually, because certain facts are specific only to a particular country."

(Id. at 26 (citing 2007 Commission Views at 126 n.779 (P.R. 940).)  Two, USS contends,

that the ITC's separate country findings are not supported by substantial evidence in

the record and, in fact, support maintaining the ADD/CVD orders.  (Id. at 28-45.)

        b.     *Analysis*

The ITC defends its conclusion, that the likely volume of subject imports would

not be significant, as supported by substantial evidence and otherwise in accordance

with law.  (ITC Resp. Br. at 44-56.)

First, the ITC disagrees with Plaintiffs that it ignored crucial evidence and

counters that it "appropriately considered combined data for the three cumulated

countries."  (Id. at 45.)  The ITC posits that its "country-specific analysis of certain data"

was a reasonable method to assess the relative economic incentives of the subject

producers to ship significant volumes of CoRe steel to the U.S. absent the ADD/CVD

orders. (Id.)  The Court is satisfied with the ITC's reasonable analysis and explanation.

Next, the ITC argues that it explicitly addressed the issue of shifting production

from non-subject merchandise to subject merchandise.  The ITC stated that it relied on

record evidence to explain that there is not substantial incentive to make such a switch,

since non-subject products like micro-alloy, alloy, and stainless steel products have

higher margins.  (ITC Resp. Br. at 54.); see citing 2007 Commission Views at 129 n.784

(C.R. 831).  Here, the Court again is satisfied with the ITC's reasonable analysis and

explanation.

The Commission defended its analysis with respect to China's role in the Asian

market and pointed to record evidence to conclude "China would remain a net

importer of corrosion-resistant steel for the foreseeable future but would import at a

slower rate due to its increased capacity."  (ITC Resp. Br. at 52.)  Thus the ITC

reasonably concluded that subject producers would continue their trend of exporting

CoRe steel regionally and would not be displaced by Chinese production in the

foreseeable future.  See 2007 Commission Views at 130 (C.R. 831).

The ITC also answered Plaintiffs' challenge that it ignored inventory evidence for

Australia, France and Japan.  (Id. at 53-54.)  The Commission in fact addressed this

issue, noting that the likely volume of CoRe steel inventories held by these three

countries, would not be significant upon revocation of the ADD/CVD orders because

most CoRe steel was "made to order and already committed to specific customers."  (Id.

(citing 2007 Commission Views at 129 n.784 (C.R. 831)).)  Moreover, Defendant-

Intervenors JFE Steel Corp. argue that Plaintiffs are, in effect, petitioning this court to

"reweigh the evidence" but point out that there is no basis to do so under the law.

(Def.-Interv. JFE Steel Br. at 25.)  On this point, the Court agrees with Defendant-

Intervenors.  See Coallition for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs.

v. United States, 22 CIT 520, 530, 15 F. Supp.2d 918, 927 (1998) ("Plaintiff's argument, in

essence, concerns the weight the Commission assigned to [one factor], which is within

its discretion.  The Court's duty is not to reweigh the evidence.").

The ITC also rebutted Plaintiffs' argument that the subject producers from

Australia, France and Japan could shift "significant amounts of production from non-

subject to subject merchandise."  (Joint Pl. Br. at 48.)  The ITC pointed to record

evidence demonstrating that there was "not much incentive [among these subject

producers] to switch" production lines [[

]]  (ITC Resp. Br. at 54-

55 (citing 2007 Commission Views at 124 (C.R. 831)).)  Here too, the Court is satisfied

with the ITC's reasonable analysis and explanation.

Finally, the ITC disagrees that it ignored the significance of the quantities of

French and Japanese exports of CoRe steel to Canada and Mexico during the POR.  (ITC

Resp. Br. at 55-56.)  The Commission responds that it relied on record evidence

indicating that France and Japan's exports to Canada remained small even after Canada

lifted its own ADD/CVD orders.  (Id. at 55.); see 2007 Commission Views at 131, 133

(C.R. 831).  Additionally, the ITC discounted Japan's 2005 exports to Mexico since they

were contractually committed to make those sales.  Id. at 131, 133.  France's exports to

Mexico were small to begin with and showed a decline.  Importantly, the ITC stressed

that having the local U.S. affiliates of French and Japanese producers was the more

significant market factor, rather than any possible interest these producers may have in

the Canadian and Mexican markets.  Id.

This Court agrees with Defendant ITC and Defendant-Intervenors, that merely

because Plaintiffs can offer evidence or marshal arguments contrary to the

Commission's findings and conclusions is not sufficient grounds to upset the

Commission's determination.  See NMB Sing., Ltd. v. United States, 27 CIT 1325, 288 F.

Supp.2d 1306 (2003).  It is the ITC's "task to evaluate the evidence it collects during its

investigation" and to determine "the weight to be assigned a particular piece of

evidence."  United States Steel Group v. United States, 96 F.3d 1352, 1357 (Fed. Cir.

1996).  Accordingly, the evidence provided by the ITC is sufficient to support the

conclusion that there would not likely be a significant volume of imports into the U.S.

upon revocation of the ADD/CVD orders.

2.       Canada

The ITC found that in the absence of the ADD/CVD orders, the likely volume of

CoRe steel imports from Canada would not be significant due to "the projected

continued strength of the Canadian market, Canadian producers' limited excess

capacity, and their long-term volume commitments to a stable customer base that could

not be readily diverted to supply new customers."  2007 Commission Views at 141 (C.R.

831).  Additionally, the ITC noted that Canadian CoRe steel has remained in the U.S.

market at consistent levels and has not displaced U.S. sales.  (Id. at 139-141.)

       During the POR, Canadian producers shipped a very high percentage of CoRe

steel to its home market, and most of the remaining balance to the U.S. market.  (Id. at

140.)  Notwithstanding the order, Canadian CoRe steel has remained in the U.S. market

at rather consistent levels.  (Id.)  Dofasco, a Canadian producer/exporter, shipped a

substantial percent of its U.S. exports pursuant to long-term contracts with the

automotive sector.  (Id.)  The ITC found that the auto producers consider the North

American market as a unified market for production and sourcing decisions.  (Id.)  The

ITC also found that any increases of CoRe steel exports from Canada to the U.S. were

not made on the basis of "price competition" with the U.S. industry.  (Id.)  Moreover,

any increase in Canadian imports over the POR did not generally displace U.S.

production or represent sales lost to Canadian product on price basis but rather

reflected increased U.S. demand or demand that U.S. producers could not supply.  (Id.)

The ITC determined that Canadian producer's capacity utilization was "high" and its

excess capacity was not "significant."  (Id.)  Additionally, inventories of Canadian

product appeared modest and would not likely contribute to a significant increase in

U.S. imports since much of this product is generally made to order and is otherwise

already committed to customers. (Id. at 140-41.)  The ITC also found that Canada is a

"net importer" of CoRe steel globally.  (Id. at 141).  Additionally, during the POR,

Canadian prices were comparable to U.S. prices.  (Id.)

> a.     *Contentions*

Plaintiff AK Steel[33] criticizes the ITC's likely volume analysis as based on

"isolated facts," which are "contradicted by the weight of the record evidence" such

that the record evidence in total does not support the Commission's conclusions.  (Joint

Pl.'s Br. at 62.)  AK Steel argues that the ITC's analysis suffers from "several flaws."

(Id.)  First, AK Steel disputes the ITC's finding that the Canadian producers' excess

capacity was "not significant."  (Joint Pl.'s Br. at 62-63 (citing 2007 Commission Views at

140 (C.R. 831)); see also AK Steel Reply Br at 11-14.)  AK Steel contends that the record

evidence that the ITC points to in support of its conclusion was analyzed "in isolation."

(Joint Pl.'s Br. at 63.)  "However, taken together, Canadian producers could increase

exports of subject merchandise to the United States by a total of [[          ]] short tons."

(Id. (citing Final Staff Report at Table CORE-I-17 and IV-20 (C.R. 743)).)

AK Steel also faults the ITC's analysis for relying on data submitted by Dofasco,

[[                                                    ]], which "purported non-price reason[s]"

to explain the [[          ]] of some [[          ]] tons of Canadian exports out of

---

[33]Plaintiffs Nucor and SDI did not appeal the ITC's determination with respect to Canada and thus did not join the arguments in their joint brief with AK Steel addressing Canada. (Joint Pl.'s Br. at 1 n.1.)

approximately [[          ]] total tons.  (<u>Id.</u> at 63.)  AK Steel argues that evidence in the

record [[                                                      ]], belies this conclusion.  (<u>Id.</u>)

[[           ]] average unit values ("AUV") for exports to the U.S. [[

          ]] for net sales in every year from 2000 to the first half of 2006.  (<u>Id.</u> at 64.)

AK Steel also points to a "market reality" ignored by the ITC in that "the shift in

auto and auto part production away from the upper-Midwest in the United States and

Canada toward the Southern United States will encourage Dofasco to seek to further

expand its shipments into the United States with even more aggressive pricing upon

revocation of the orders."  (<u>Id.</u> at 65 (<u>citing</u> Nucor/SDI Prehearing Br. at Ex. 11 (C.R.

553)).)  AK Steel proffers that the ITC ignored "the deteriorating state of the North

American auto industry—the largest consumer of CoRe steel," which undermines the

Commission conclusion that Canadian demand is forecast to remain strong in the near

future.  (<u>Id.</u> at 66.)

AK Steel also challenges the Commission's conclusion that Canadian exports of

CoRe steel to the U.S. will not likely increase significantly upon revocation of the order

due to a forecast that production and demand will remain strong in Canada.  AK Steel

argues that this conclusion is erroneous and based upon "a misinterpretation of

[[          ]] business plan and its assertion that exports to the United States will

decline."  (<u>Id.</u> at 65.)  AK Steel offers that the business plan actually shows that

*Consol. Case No. 07-00071*                                          ***Page 79***

[[



]].

(<u>Id.</u> at 66.)  Thus according to AK steel, this demonstrates that the [[          ]] business

plan supports the opposite conclusion—that [[

]].  (<u>Id.</u>)

Finally, AK Steel argues that "Canada's status as a net importer of CoRe steel

simply increases the likelihood that Canadian producers, facing lost sales at home, will

seek to dump steel abroad."  (<u>Id.</u> at 67.)

Defendant-Intervenor Dofasco argued in support of the ITC's likely volume

analysis with respect to Canada.  (Dofasco Resp. Br. at 43-47.)  The Court finds

Dofasco's arguments are substantially similar to those presented by the ITC and

therefore, the Court will not recount them one by one in this opinion, although they

have been fully considered.

       *b.*    *Analysis*

The ITC defends its determination and argues that it did in fact consider the

Canadian industry's excess capacity in 2005, but also notes that its capacity utilization

rate was rather high at [[   ]]% at that same time.  (ITC Resp. Br. at 65.)  Additionally,

the ITC noted that Canadian CoRe steel remained in the U.S. market at rather consistent

levels during the POR.  (<u>Id.</u>)  This Court agrees with Defendant and Dofacso that AK

Steel's arguments here are by and large attempts to re-weigh the evidence.  For

example, AK Steel's challenge to the ITC's conclusion that the Canadian producers'

excess capacity was "not significant" is baseless.  AK Steel "cites the raw tonnage . . .

[but] ignores the percentage capacity utilization figure for Canada, which was nearly

[[  ]]% at the end of the POR."  (Dofasco Resp. Br. at 43.)  Moreover, it was reasonable

for the ITC to conclude that the end-of-period inventories were not likely to contribute

to significant increase in imports since it had determined that CoRe steel "inventories

typically represent supply that has been made to order and already committed to a

customer."  2007 Commission Views at 141 (C.R. 831).

　　　Next, the Court considers AK Steel's challenge that the record does not support

that there were non-price reasons for Canadian shipments of CoRe to the U.S. during

the POR.  AK Steel cites to average unit value ("AUV") data to support its assertion that

[[              ]] AUV for its exports to the U.S. may be lower than those for [[           ]]

and thus certain Canadian CoRe steel was being offered to [[

                              ]].  (Joint Pl.'s Br. at 64.)  First, this Court agrees with the ITC

that AUV data is not dispositive proof of underselling because this data is only reliable

if the product mix is constant over time.  See Ugine-Savoie Imphy v. United States, 26

CIT 851, 861, 248 F. Supp. 2d 1208, 1218 (2002) (ITC acted reasonably in disregarding

AUV data because of variance in product mix); Allegheny Ludlum Corp. v. United

<u>States</u>, 287 F.3d 1365, 1373-74 (Fed. Cir. 2002) (describing narrow circumstances where

the ITC may use AUV data as indicators of price trends).  Second, in any case, the ITC is

required by statute to make its determination based on the industry as a whole.  <u>See</u> 19

U.S.C. § 1675a.  Finally, the ITC points to record evidence disputing the charge that

[[          ]] undersold [[          ]].  The record shows that [[          ]] reported in its

questionnaire that [[

                    ]].  (Conf. Appendix, Joint Pl.'s Br. at Tab 8.)  Additionally, the record

shows that there are non-price factors that [[          ]] questionnaire response indicated

were significant in purchasing decisions, such as ability to meet quality and delivery

requirements.  (ITC Resp. Br. at 66.)  Consequently, AK Steel's argument here too must

fail, as the Court is satisfied with the ITC's reasonable analysis and explanation.

    The Court also finds meritless AK Steel's argument that the ITC failed to

consider the "deteriorating state of the North American auto industry."  (Joint Pl. Br. at

66.)  As Amici Curiae point out, the ITC specifically considered that "[p]roduction and

demand in the Canadian automotive [industry] are forecast to remain strong through

2008, and thus to continue as the major outlet for Canadian corrosion-resistant steel

production."  (Amici Curiae Br. at 27 (<u>citing</u> 2007 Commission Views at 138 (P.R. 940).)

Moreover, AK Steel points to no record evidence concerning the "timing or magnitude"

of its argument that, as the auto industry shifts to the Southern U.S., Dofasco will seek

to expand therein with aggressive pricing.  Such speculation is undoubtedly beyond the

"reasonably foreseeable time" frame that the ITC is required to consider.  See Nucor

Corp. v. United States, 28 CIT 188, 233, 318 F. Supp. 2d 1207, 1247 (2004) (Absent a

showing to the contrary, the ITC is presumed to have considered all of the evidence in

the record, and is not required to explicitly address every piece presented by the

parties.)  Accordingly, the Court is satisfied with the ITC's reasonable analysis and

explanation and finds that it is supported by substantial evidence.

The ITC refutes AK Steel's argument challenging its finding that demand in the

Canadian market would remain strong because of evidence presented in Dofasco's

business plan about its plan to supply a new Toyota plant in Ontario near Dofasco's

mill.  (ITC Resp. Br. at 66.)  The ITC notes that AK Steel's dispute with this evidence is

that it "would not be fully realized until 2008."  (Id.)  However, this time frame is well-

within the ambit of "reasonably foreseeable future," see 2007 Commission Views at 120

(C.R. 831), and the ITC could weigh this evidence in a reasonable manner.  The Court is

satisfied with the ITC's reasonable analysis and explanation.

### 3.    Germany & Korea

With respect to Germany & Korea, the Commission found that the likely volume

of cumulated CoRe steel imports would be significant if the orders were revoked.  2007

Commission Views at 146 (C.R. 831).  The ITC found that German and Korean

producers nearly doubled their combined production capacity since 1992 and increased

their production of CoRe steel from [[            ]] short tons in 1992 to [[             ]]

short tons in 2005.  (<u>Id.</u> at 143.)  Together, the countries had a combined excess capacity

of [[            ]] short tons in 2005, equivalent to [[    ]]% of apparent U.S. consumption.

(<u>Id.</u>)  In addition, both Germany and Korea were found by the ITC to be "export-

oriented."  (<u>Id.</u> at 143.)  Moreover, the ITC determined that German producer

ThyssenKrupp was affiliated with a significant distributer in the U.S., and Korean

producers had significant relationships with U.S. customers.  (<u>Id.</u> at 144.)

        ThyssenKrupp indicated plans to establish a production facility in North

America, but the ITC found that the record supported a conclusion that this was not

likely in the foreseeable future.  (<u>Id.</u> at 145.)  Korean producer POSCO indicated plans to

build a production facility in Mexico, but the record too supported a conclusion that this

was not likely in the foreseeable future.  (<u>Id.</u> at 145; <u>see also</u> <u>supra</u> note 24.)

        The ITC also concluded, supported by record evidence, that Korean CoRe steel

producers would have price motivation to increase shipments to the U.S. market, given

that U.S. prices for CoRe steel were typically higher than in many Asian markets and a

significant portion of its exports were not supplied under long-term contracts.  (<u>Id</u> at

145-146.)

        Thus the ITC concluded that record evidence indicates that German and Korean

producers would be able to ship significant volumes of CoRe steel to the U.S. market if

the ADD/CVD orders were revoked, due to their combined substantial capacity and

production, excess capacity, general export-orientation, the substantial and increasing

level of their exports to the United States during the POR, and well-established U.S.

based relationships or distribution channels.  (<u>Id.</u> at 146.)  The ITC also found that

generally higher prices in the U.S. than in other Asian markets gave both German and

Korean producers incentive to redirect volumes currently exported to Asia to the U.S.

market.  (<u>Id.</u>)

                    *a.*        *Contentions*

        German Plaintiffs challenge the ITC's affirmative determination in its likely

volume analysis for Germany & Korea as not supported by substantial evidence or not

otherwise in accordance with law.  (German Pl.'s Br. at 37-39.)  German Plaintiffs argue

that the ITC ignored the fact that German and Korean CoRe steel imports have

"remained relatively steady" throughout the life of the orders despite changes in factors

such as price, capacity utilization, production costs, etc.  (<u>Id.</u> at 38.)  They contend that

the conclusion to draw from this data is that "import patterns are unlikely to change

and have any resultant effect on the domestic industry upon revocation."  (<u>Id.</u>)  German

Plaintiffs note that, by comparison to the other subject countries, Germany and Korea

"have shipped relatively steady volumes without dramatic or unreasonable

fluctuations."  (Id. at 39.)  The others have ceased shipments (Australia and France

between the original investigation and the first sunset review), experienced dramatic

increases in exports (Canada), or decreases in market share (Japan went from a

"substantial" market share in the U.S. to a "minimal" one).  (Id. at 39 n.38.)

German Plaintiffs, in short, contend that the ITC "relied on isolated data points,

misconstrued facts and performed partial analyses to support its determination.  Such

methodology does not rise to the level of substantial evidence."  (German Pl.'s Reply Br.

at 6.)

> b.      *Analysis*

The Court disagrees with German Plaintiffs.  First, German Plaintiffs appear to

challenge the ITC's interpretation of the record data and the relative weight accorded by

the Commission to certain factors or not at all.  This, however, is not the proper forum

for such complaints.  See Siderca S.A.I.C. v. United States, 29 CIT 1030, 1048, 391 F.

Supp. 2d 1353, 1369 (2005) (the role of the Court is not to "re-decide the question before

the agency").

Next, though German Plaintiffs cite to the record to show that German and

Korean imports remained "relatively steady" during the period that the orders were in

effect, the Court is not persuaded that this is a legally significant fact.  The test is "in

order to find sufficient volume for there to be injury, the ITC must identify substantial

evidence from the record demonstrating that, should the orders be revoked, it is likely

that the volume of the subject imports entering the U.S. market will be significant."

Nippon Steel Corp., 29 CIT at 712, 391 F. Supp. 2d at 1275.  Further, the ITC must also

consider whether the likely volume would be "significant" in absolute terms, or relative

to production or consumption in the United States.  See 19 U.S.C. § 1677(7)(C)(i).

Looking to the ITC Staff Report, the cumulated volume of imports from Germany and

Korea was 382,705 short tons in 1992, which increased to 406,799 short tons by 2005.

2007 Commission Views at 140 (P.R. 940); 2007 Sunset Review Information at Table

CORE-I-1, I-13 (P.R. 941).  Additionally, German and Korean producers substantially

increased capacity and production of CoRe steel from the initial investigation through

the POR.  2007 Commission Views at 140-41 (P.R. 940); 2007 Commission Views at 143

(C.R. 831); Tables CORE-IV-36 and CORE-IV-54 (C.R. 743).  In 2005, German and

Korean producers had substantial combined excess capacity.  2007 Commission Views

at 143 (C.R. Doc. 831); Tables CORE-IV-36 and CORE-IV-54 (C.R. Doc. 743).  German

and Korean CoRe industries are export oriented, with Korea exporting approximately

29% of total shipments in every year of the POR, 2007 Commission Views at 143-44 (CR

Doc. 831); 2007 Sunset Review Information at Table CORE-IV-56 (P.R. Doc. 941), and

Germany exporting over [[   ]]% of total shipments in every year of the POR.  2007

Commission Views at 143-44 (CR Doc. 831); Table CORE-IV-38 (CR Doc.743).  German

and Korean producers have shown a strong interest in exporting to the U.S., with

aggregate exports increasing from [[          ]] short tons in 2000 to [[          ]] short tons

in 2005, a [[          ]]% increase, despite the existence of the orders.  2007 Commission

Views at 144 (C.R. Doc. 831); Tables CORE-IV-38 and CORE-IV-56 (C.R. Doc. 7 ).  The

interest of German and Korean producers in the U.S. market, combined with

insufficient U.S. production facilities, indicates that they would likely deepen their

participation in the U.S. market through exports from Germany and Korea.  2007

Commission Views at 144-45 (C.R. Doc. 831).  The increased volume of cumulated

subject imports would likely occur in both the construction and automotive end-use

sectors for CoRe steel.  2007 Commission Views at 145 (C.R. 831).  German and Korean

producers would likely have economic incentives to increase or shift/redirect sales to

the U.S. market due to generally higher U.S. prices.  2007 Commission Views at 145-46

(C.R. Doc. 831).  German and Korean producers have strong relationships with U.S.

distributors and/or customers that would facilitate increased exports to the U.S.  2007

Commission Views at 146 (C.R. Doc. 831).

     Given this record, the ITC could reasonably conclude that the cumulated

volumes would be significant upon revocation and this Court finds that such

determination was supported by substantial evidence.  Accordingly, this Court rejects

the challenges by Plaintiffs, and holds that the ITC's likely volume determinations were

reasonable exercises of its discretion, supported by substantial evidence and are

otherwise in accordance with law.

### C.       Likely Price Effect

Having discussed the ITC's treatment of the likely volume factor in its material

injury determination, the Court will consider the second statutory factor: likely price

effects of subject imports in the event of revocation.  <u>See</u> 19 U.S.C. §§ 1675a(a)(1) & (3).

The ITC is required by statute to consider two sub-factors in evaluating the likely price

effects.  These are (1) whether "there is likely to be significant price underselling by the

imports of the subject merchandise as compared with domestic like products," and (2)

whether the "imports of the subject merchandise are likely to enter the United States at

prices that otherwise would have a significant depressing or suppressing effect on the

price of domestic like products."  19 U.S.C. § 1675a(a)(3).

### 1.       <u>Australia, France & Japan</u>

The ITC determined that the cumulated subject imports from Australia, France

and Japan will not likely have significant adverse (depressing or suppressing) price

effects if the ADD/CVD orders were revoked.  2007 Commission Views at 134-36 (C.R.

831).  According to the Commission, the record showed that domestic prices were

strong and, in fact, rose during the POR as a result of rapidly growing demand and

outstripped sharp increases in raw materials and energy costs.  <u>Id.</u> at 134-35.

Additionally, the ITC found that the domestic industry had been able to lower its fixed

costs as a result of industry-wide restructuring, which enabled it to manage output and

maintain prices notwithstanding rising input costs.  Id. at 135.  Moreover, though some

prices fell on certain products in mid-2006, several domestic producers announced price

increases at the same time, while other domestic producers were able to negotiate

higher contract prices for the second half of 2006 and 2007.  Id.

The ITC stated that there were no U.S. price comparisons on the record for sales

of Australian and French CoRe steel during the POR and that Japanese CoRe steel

oversold the U.S. product in 15 out of 20 comparisons.  2007 Commission Views at 132

(P.R. 940) (citing Table CORE-V-17).

Finally, notwithstanding the fact that certain auto producer executives (major

purchasers of CoRe steel) testified before the Commission stating that the greater

availability of subject imports would be useful as leverage in domestic supply price

negotiations to obtain more favorable prices, the ITC found that Australian, French and

Japanese producers had neither the capacity nor incentive to ship significant quantities

of CoRe steel to the U.S. upon revocation.[34]  2007 Commission Views at 135-36 (C.R.

---

[34]Plaintiffs urged the Commission to treat the Auto Producers' testimony as an
"admission against interest."  The ITC declined because, with respect to imports from
Australia, France and Japan, the record does not support the Auto Producers' assertion.
Moreover, the ITC had determined that the subject producers have neither incentive nor
capacity to ship significant quantities of CoRe steel to the U.S. upon revocation.
Deprived of a need or incentive to ship substantial quantities into the U.S. market,

831).

>           *a.*      *Contentions*

Plaintiffs contend, again on several grounds, that the ITC's likely price effects analysis is not supported by substantial evidence and is otherwise not in accordance with law.  (USS Br. at 45-48; Joint Pl.'s Br. 39-43.)

First, USS argues that the ITC's finding that producers in Australia, France and Japan have no incentive to price aggressively in the U.S. market is unsupported by substantial evidence.  (USS Br. at 48.)  Suggesting that the ITC may have ignored detracting evidence demonstrating the significance of price in purchasing decisions, USS argues that because CoRe steel is "generally substitutable, provided [that] suppliers meet qualification requirements, . . . price is an important factor in purchasing decisions."  (Id. at 46 (citing 2007 Commission Views at 132 (P.R. 940)).)

USS also contends that the ITC never explained "why stronger U.S. prices would cause Australian, French and Japanese producers to have 'no incentive' to price aggressively in this market."  (Id. at 46.)  Indeed, USS argues, rising costs coupled with rising U.S. prices cut in favor of the likelihood that subject imports would have

---

subject producers lack any incentive to price aggressively for such limited sales that could be made or offered upon revocation.  Considering that the dramatic rise in prices in 2004–2006, was a global phenomenon, subject producers have no incentive to partner with the U.S. auto producers in an attempt to drive down prices in the U.S. market.  See 2007 Commission Views at 136 (C.R. 831).

significant price effects.  (<u>Id.</u> at 47.)  More to the point, USS argues, the ITC decided

exactly that with respect to its affirmative price analysis for Germany and Korea.  (<u>Id.</u> at

47 (<u>citing</u> 2007 Commission Views at 144-145 (P.R. 940) (ITC finding that higher prices

in the U.S. compared with "key Asian markets" would enable Korean producers, and to

a lesser extent German producers, to obtain higher prices in the U.S. while still

underselling U.S. producers.)))  This contradiction, USS contends, demands a remand.

(<u>Id.</u>)

      Next, USS and Joint Plaintiffs complain that the evidence supporting increases in

U.S. CoRe steel prices were "not as significant as . . . suggested."  (<u>Id.</u> at 48; Joint Pl.'s Br.

at 42-43.)  USS points to the fact that contract sales to the auto producers lagged behind

increases in the spot market.  (USS Br. at 48.)  Also, most supply contracts with the auto

industry, though commanding higher prices in 2006–2007, were for shorter durations (1

year).  (<u>Id.</u>)  Consequently, the revocation of the orders would undoubtedly affect prices

when the auto supply contracts would come up for renegotiation.  (<u>Id.</u>)  Plaintiffs

contend that the failure of the ITC to address these arguments and evidence

undermines its conclusion with regard to the auto contracts.  (USS Br. at 48.)

      Both USS and Joint Plaintiffs argue that the ITC erroneously failed to credit

certain ITC hearing statements made by the Amici Curiae Auto Producers as

"admissions against interest."  (USS Br. 55–59; Joint Pl.'s Br. at 39-42.)  Plaintiffs contend

that the Amici Curiae Auto Producers were presented "front and center" at the

Commission hearings in opposition to the continuation of the ADD/CVD orders.  (USS

Br. at 55–56.)  Plaintiffs point to the testimony of a few auto producer executives who

explained that revocation of the ADD/CVD orders and the availability of more subject

imports would be utilized to "leverage down" prices.  (USS Br. 56; see also Joint Pl.'s Br.

39) (Both citing Transcript ("Tr.") of U.S. Int'l Trade Comm'n Hearing (Oct. 17, 2006) at

422 (General Motors, Dr. G. Mustafa Mohatarem) and 455 (General Motors, Mr. Richard

Cover) (P.R. 528).)  USS posits that since the Auto Producers testified on behalf of

Respondents, this crucial testimony was an "admission against interest" by

Respondents, which "should have, effectively ended [this case] right then and there."

(USS Br. at 57.)  Moreover, Plaintiffs are confounded by the ITC's negative

determination regarding Germany and Korea, wherein the Commission found that their

cumulated quantities of subject imports would serve as leverage on prices in

negotiations between the Auto Producers and domestic CoRe steel producers.  (USS Br.

at 57-58.)  The distinction drawn by the ITC between Germany and Korea, on the one

hand, and the other subject countries, on the other, was "simply made up out of whole

cloth." (USS Br. at 59.)  Additionally, Joint Plaintiffs characterized the ITC's failure to

credit the admission by Auto Producers and instead provide a rationale for "what the

auto industry really intended to say," as "reversible error."  (Joint Pl.'s Br. at 40.)  Thus,

Plaintiffs conclude, the ITC's evidentiary determination was not supported by substantial evidence.

> b.    *Analysis*

This Court finds, for the reasons noted below, that ITC's likely price effects determination is supported by substantial evidence and is in accordance with law. First, Plaintiffs' challenge of the ITC's finding that producers in Australia, France and Japan have no incentive to price aggressively is untenable in the face of record evidence. See Nucor Corp., 318 F. Supp.2d at 1247 (The ITC is "presumed to have considered all of the evidence on the record" and is not "required to explicitly address every piece of evidence presented by the parties."). Additionally, this Court agrees with Defendant-Intervenor JFE Steel Corp. that the Plaintiffs' arguments on pricing are "merely another form of disagreement with the Commission's conclusion on volume." (Def.-Interv. JFE Steel Resp. Br. at 47.) The ITC found support in the record that showed that Australia, France and Japan lacked any incentive to aggressively price limited sales or offers post-revocation. 2007 Commission Views at 133-134 (P.R. 940). This Court finds that the ITC's determination in this regard was reasonable and supported by substantial record evidence. Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938) (citations omitted) (The ITC has thus provided "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").

Next, the Court rejects USS's remand demand based on its claim that a "direct contradiction" exists between the ITC's price effects analysis on Australia, France and Japan and that of German and Korea.  (USS Br. at 46-47.)  Plaintiffs' mischaracterization of the ITC findings cannot be sustained.  The ITC based its price analysis of Germany and Korea on certain regional data published by MEPS and [[      ]].  2007 Commission Views at 145 (C.R. 831).  The ITC's observation of the data for Korea in 2005 and 2006 showed that its pricing was generally lower than U.S. pricing, and pricing data for China and the Far East were also consistently lower.  Id.  The ITC concluded that this data demonstrated an incentive for Korea to shift some sales from Asia to the U.S. market to obtain higher prices.  Id.  Furthermore, the ITC found that a similar comparison would give German producers a similar incentive to redirect its Asian exports to the U.S.  Id. at 145-46.  These findings therefore are consistent with the ITC findings and conclusions with respect to Australia, France and Japan, namely that cumulated producers from these three countries have no incentive to price aggressively. Thus the Court finds that the ITC's determination here was reasonable and supported by substantial record evidence.

The Court also rejects Plaintiffs' arguments focused on the revised, shorter-term auto contracts.  The ITC defends its determination here, noting that it did evaluate and consider that auto contracts were generally shorter at the end of the POR.  However, the

record indicated the shortened life span of these contracts neither favored the CoRe

producers nor the auto manufacturers.  (ITC Resp. Br. at 57 (<u>citing</u> 2007 Commission

Views at 127 (C.R. 831)).)  Notwithstanding, Plaintiffs ignore that some domestic

producers managed to obtain [[                    ]] price increases in their contracts in the

second half of 2006 and in 2007.  2007 Commission Views at 135, n.844 (C.R. 831).  Thus

the Court finds that the ITC's determination was reasonable and supported by

substantial record evidence.

Finally, this Court addresses Plaintiffs' challenge that the ITC read a non-existent

distinction into the Auto Producers' testimony and failed to weigh certain testimony in

Plaintiffs' favor.  The Court agrees that, based on the record evidence, it was reasonable

for the ITC to find that though the Auto Producers could gain increased "leverage" in

price negotiations derived from the threat of increased imports from Germany and

Korea, such leverage might not exist with respect to Australia, France and Japan.  2007

Commission Views at 133, 145 (P.R. 940).

Reviewing the testimony of the Auto Producer executives from General Motors

at the ITC hearing, the Court observes that the testimony is riddled with generalities

and is unspecific about which subject countries GM would solicit to "observe the level

of interest and energy that those countries would put into winning [GM's] business."

Hearing Tr. at 456 (General Motors, Mr. Richard Cover) (P.R. 528).

Turning to Plaintiffs' challenge that Auto Producers' statements are "statements against interest," this Court rejects such arguments as likely irrelevant.  First, Plaintiffs cite no authority as to the efficacy of this evidentiary rule in a Commission proceeding.  Second, it is doubtful that an exception to the hearsay rule, codified in Fed. R. Evid. 801(d)(2), governs in a case where "the ITC may, and indeed must, consider all evidence presented which comprises the record."  Wells Mfg. Co. v. United States, 11 CIT 911, 921, 677 F. Supp. 1239, 1247 (1987).  Third, USS admits that "[u]ltimately . . . whether such testimony is treated as an admission against interest is a secondary matter."  (USS Br. at 58.)  Finally, under the standard of review in this case, it was not an error of law for the ITC to accept Auto Producers' testimony and not treat it as an admission against their interest.  The Commission is required to consider "all evidence presented," Wells Mfg. Co., 677 F. Supp. at 1247, and thus a supposed evidentiary ruling (or lack thereof) here ultimately goes to the weight of the evidence under consideration.  This Court in turn reviews Commission determinations regarding the weight of evidence under the "substantial evidence" standard.  See 19 U.S.C. § 1516a(b)(1)(B)(i) (2000) (CIT will uphold a factual determination by the ITC unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law").  Therefore, this Court holds that the ITC's determination was reasonable and supported by substantial evidence.

2.    Canada

The ITC found that CoRe steel from Canada will not likely have significant adverse price effects if the order is revoked.  2007 Commission Views at 142 (C.R. 831). This determination predicated on the consistent level of Canadian product in the U.S. market during a period where prices were strong relative to rising costs, and finding that the volume of Canadian CoRe steel is not likely to increase significantly if the order is revoked.  Id.

*a.    Contentions*

AK Steel contends that the Commission's determination is faulty because it failed to consider current underselling by Canada.  (Joint Pl.'s Br. at 43-45.)  Additionally, AK Steel maintains that the ITC's price effects analysis for Canada was premised on its finding that volume of subject imports from Canada would not increase significantly. (Joint Pl.'s Br. at 43.)  Supported by record evidence that there is "current and significant" underselling ("62 percent of the time despite the discipline of the orders") by Canadian subject imports, coupled with the importance of price in negotiations, Plaintiff AK Steel contends that it is "illogical to conclude that Canadian producers will not attempt to gain a greater proportion of the market through aggressive pricing." (Joint Pl.'s Br. at 44-45.)  Thus the ITC's finding is unsupported by substantial evidence and is not in accordance with law.  (Id.)

    b.    *Analysis*

The Court agrees with Defendant-Intervenor Dofasco that AK Steel's attacks here

are yet another attempt to "re-weigh the record evidence." (Def.-Interv. Dofasco Resp.

Br. at 47.) Dofasco concedes that the ITC "note[d] a mixed pattern of underselling, with

overall Canadian overselling in 19 of 50 comparisons and underselling in 31." (<u>Id.</u> at 48

(<u>citing</u> 2007 Commission Views at 142 (C.R. 831)).) However, AK Steel's "spin" on the

62% underselling argument does not explain the full story. Dofasco explains that U.S.

and Canadian contract prices were [[



                                     ]]. <u>See</u> Final Staff Report at CORE-V-34 (C.R.

743) (emphasis in original)). As detailed in the ITC Staff Report, [[



            ]]. <u>Id.</u> at CORE-V-36 n.26. This could explain why when U.S.

spot sales [[




    ]]. <u>Id.</u> at CORE-V-34 (Figure CORE-V-10). In light of the foregoing then, the Court

is satisfied that the ITC's review of the administrative record and its characterization of

the underselling/overselling pattern as "mixed" is supported by substantial evidence

and is reasonable.  Therefore AK Steel's arguments are untenable.

      3.    <u>Germany & Korea</u>

The ITC determined that the revocation of the orders on subject imports from Germany and Korea would likely result in significant adverse price effects.  2007 Commission Views at 148. (C.R. 831).  The ITC's conclusion appears to be based on the expectation that the substantially larger volume of subject imports from Germany and Korea that are likely to enter the U.S. market upon revocation would either be priced aggressively to capture market share, or leveraged by purchasers to obtain more favorable domestic prices, depressing or suppressing domestic prices to a significant degree.  <u>Id.</u>

Additionally, the ITC based its price analysis of Germany and Korea on certain regional data published by MEPS and [[     ]].  2007 Commission Views at 145 (C.R. 831).  The ITC's observation of the MEPS data for Korea in 2005 and 2006 showed that that pricing was lower than U.S. pricing and [[     ]] data indicating that pricing for "China" and "Far East" was also lower than U.S. pricing.  <u>Id.</u>  The ITC found that this data demonstrated an incentive for Korea to shift some sales from Asia to the U.S. market to obtain higher prices.  <u>Id.</u>  Further, the ITC found that the same comparison would give German producers the same incentive to redirect its Asian exports to the U.S.  <u>Id.</u> at 144.

Finally, the Commission also found that German and Korean cumulated subject imports would serve as leverage on prices in negotiations between the Auto Producers and domestic CoRe steel producers.  Id. at 146.

> a.      *Contentions*

German Plaintiffs contend that the record evidence "confirms" that German and Korean CoRe imports are "simply too small to be a price leader or have significant price effects."  (German Pl. Br. at 39-40.)  German Plaintiffs argue that German and Korean CoRe steel producers are experiencing strong regional demand and (at least for Germany) home and regional prices are equal to or greater than U.S. prices, thus there is no incentive for the German producers to increase their U.S. import volumes and suppress/depress U.S. prices. (Id. at 40 (citing Final Staff Report at CORE-IV-103, CORE-IV-93, Table CORE-IV-68; and at CORE-IV-94, Table CORE-IV-69) (C.R. 743).)

Second, German Plaintiffs' contend that there is no incentive for German or Korean CoRe steel producers "to expand their sales to other U.S. automotive producers and engage in aggressive pricing."  (Id.)  This is a result of German producers' U.S. sales being dedicated to a select group of long-term customers and Korean producers' automotive industry sales being targeted to long-standing relationships with "Korean transplants establishing their facilities" in the U.S.  (Id.)

German Plaintiff's conclude that the ITC based its likely price effects

determination on "on pure speculation and conjecture." (Id. at 41.)  The ITC should

have considered "the consistent overselling of German CoRe throughout the life of the

AD[D] order, [[      ]] of which was for automotive applications during the POR," and

that Korean producers sell "negligible" volumes to the auto industry.  (Id.)  Thus,

German Plaintiffs argue the ITC's determination is devoid of substantial evidence or

otherwise is not in accordance with law.  (Id.)

> b.      *Analysis*

Notwithstanding the German Plaintiffs' contentions, the Court finds that there is

extensive evidence on the record that supports the ITC's price effects analysis.  First,

there is ample evidence in the record that supports the ITC's conclusion that German

and Korean imports would be used to leverage down domestic CoRe steel prices.  See

2007 Commission Views at 12, 146-48 (C.R. 831).  Second, German Plaintiffs cite to the

ITC investigations to show its imports were "too small" to have adverse price effects.

(German Pl. Br. at 39-40 n.39; see, e.g. Am. Bearing Mfrs. Ass'n v. United States, 350 F.

Supp. 2d 1100, 1126-27 (CIT 2004).)  The cases cited by German Plaintiffs are inapposite,

however.  During an investigation, the Commission evaluates trade behavior absent the

discipline of the order.  In a sunset review therefore, the ITC must conduct a

prospective analysis and determine the likely volume and pricing behavior once the

discipline of the order is removed.  Resultantly, current data (i.e., during the POR) on

volume and pricing behavior, are more probative in sunset reviews than data from

investigations, so German's Plaintiffs' arguments in this regard too must fail.  Finally,

the balance of the German Plaintiffs' arguments appear to be pleas to this Court to re-

weigh evidence and remand to the ITC for an alternative conclusion.  As has been oft

repeated, this Court cannot countenance such a request.  See Usinor, 28 CIT at 1111.

Accordingly, this Court rejects the challenges by Plaintiffs, and holds that the

ITC's likely price effects determinations were reasonable exercises of its discretion,

supported by substantial evidence and were otherwise in accordance with law.

### D.    Impact of Imports on Domestic Industry & Vulnerability of Domestic Industry

The third factor that the ITC is required to investigate concerns the likely impact

of subject imports the on domestic industry in the event of revocation.  See 19 U.S.C.

§ 1675a(a)(4)(A)-(C).  The ITC is required to consider "whether the industry is

vulnerable to material injury if the order is revoked" in the context of determining

"whether revocation . . . would be likely to lead to continuation or recurrence of

material injury within a reasonably foreseeable time."  19 U.S.C. § 1675a(a)(1).

The SAA provides that in assessing the U.S. industry's vulnerability to injury if

an order is revoked, the Commission:

> considers, in addition to imports, other factors that may be
> contributing to overall injury.  While these factors, in some
> cases, may account for the injury to the domestic industry,

> they may also demonstrate that an industry is facing
> difficulties from a variety of sources and is vulnerable to
> dumped or subsidized imports.

SAA at 885.

    1.    <u>Australia, France, Japan & Canada</u>

The ITC concluded that, upon the revocation of the orders, any CoRe steel

imports from Australia, France, Japan & Canada were not likely to have a significant

adverse impact on the domestic industry within a reasonably foreseeable time.  <u>See</u> 2007

Commission Views at 10, 136-39, 142-43 (C.R. 831).  Specifically, cumulated imports of

CoRe steel from Australia, France & Japan and CoRe steel from Canada would not

likely have significant adverse volume or negative price effects on the domestic

industry.  (<u>Id.</u> at 136-139 (Australia, France & Japan) and 142-43 (Canada).)

Additionally, the ITC found that, although the domestic CoRe steel industry "did

benefit to some degree" from the orders, during the second review, as a result of the

restructuring and consolidation within the steel industry, it concluded that the domestic

industry was not vulnerable, and indeed may be stronger and healthier than in

previous periods of review.  <u>Id.</u> at 136 n.849, 143.

    *a.*    *Contentions*

Joint Plaintiffs and USS first make a broadside challenge to the ITC's

vulnerability finding and argue that the domestic industry is still vulnerable to injury

from imports from Australia, France, Japan & Canada.[35]  (Joint Pl.'s Br. at 69, n.17; USS

Br. at 49; <u>see also</u> AK Steel Reply Br. at 14-17.)  Joint Plaintiffs and USS further contend

that the ITC's impact and vulnerability determinations are flawed and unsupported by

substantial evidence since they are based on "insignificant" likely volume and price

effects.  (Joint Pl.'s Br. at 69-74; USS Br. at 49-55.)  Essentially, Joint Plaintiffs argue that

the ITC's conclusions—that the domestic industry is not vulnerable and that imports

would not be likely to increase upon the revocation of the orders—are mistaken.  (Joint

Pl.'s Br. at 69-74.)  Joint Plaintiffs argue that the ITC cannot rely on a conclusion that the

foreign producers (<u>i.e.</u>, producers from Australia, France, Japan and Canada) currently

exhibit a "lack of interest" in the market because the orders have imposed discipline on

them.  (<u>Id.</u>)  Pointing to the foreign producers' aberrant behavior from <u>before</u> the orders

were imposed (back in 1991-1992, where cumulated imports increased by 22%), Joint

Plaintiffs aver that the foreign producers will flood the U.S. market with imports.  (<u>Id.</u>)

     Joint Plaintiffs and USS also argue that the ITC ignores evidence showing that

the great advances made by the domestic industry—<u>i.e.</u>, restructurings and

consolidations—during the POR "have been steadily eroding as a result of rapidly

---

[35]AK Steel separately challenges the ITC's impact/vulnerability determination on
Canada.  By means of a footnote in the Joint Plaintiffs' Brief, AK Steel adopts the
arguments advanced for Australia, France and Japan as equally applicable to Canada.
<u>See</u> Joint Pl.'s Br. at 69 n.17 ("[T]he Commission's vulnerability finding . . . is equally
applicable to both [the likely impact determination and vulnerability finding] . . . with
respect to subject imports from [Australia, France, Japan, and Canada].")

increasing raw material and energy costs.  (Id. at 70-71, n.18; USS Br. at 53-55.)  Joint

Plaintiffs evoke comparisons to the first review where the industry's operating margins

had declined to 5.9% in 1999 (from 10.5% in 1997) to current trends where the

"operating margin[s] declined from 10.8 percent in 2004 to 4.9 percent in 2005, and from

7.6 percent in [the] first half [of] 2005 to 5.2 percent for [the] first half [of] 2006."  (Joint

Pl.'s Br. at 71.)  "Nowhere," Joint Plaintiffs contend, does the Commission "explain this

apparent inconsistency."  (Id.)

        Finally, Joint Plaintiffs and USS also argue that varying assertions in the ITC's

determination regarding the impact of sales to the auto industry on prices—such as

"major U.S. suppliers to the auto industry were able to negotiate higher contract prices

. . . a positive sign"— are incorrect and, as expressed by AK Steel, "contrary to the

clearly expressed desire of the [auto producers] to use revocation of relief to negotiate

lower prices from the domestic CORE producers."  (USS Br. at 51; AK Steel Reply Br. at

20; see also Joint Pl.'s Br. at 73-74; USS Br. at 51-52; AK Steel Reply Br. at 14-20.)

                    b.      Analysis

        This Court agrees with the ITC that the arguments by Nucor/SDI, USS, and AK

Steel[36] amount to little more than an inappropriate attempt "to persuade this Court to

---

        [36]To the extent that AK Steel made arguments in its reply brief, which had not
been first raised in its moving papers, this Court will not consider them.  See Processed
Plastics Co. v. United States, 473 F.3d. 1164, 1172 (Fed. Cir. 2006) (noting that the court
does not usually consider arguments first raised in reply briefs); F.T.C v. Med. Billers

re-weigh the evidence on vulnerability."[37]  (ITC Resp. Br. at 60.)  The Court finds that

the Commission carefully evaluated the ample record evidence as a whole and

reasonably concluded that the industry was no longer vulnerable.  See 2007

Commission Views at 136-39, 142-43 (C.R. 831).  The various arguments proffered by

Nucor/SDI, USS, and AK Steel that challenge the ITC's vulnerability determination,

have been considered[38] and are found to be meritless because none of the plaintiffs have

demonstrated that the ITC's impact and vulnerability determinations lacked "[a]

rational connection between the facts found and the choice made."  Burlington Truck

_____

Network, Inc., 543 F. Supp.2d 283, 313 n.32 (S.D.N.Y. 2008); Playboy Enter., Inc. v. Dumas, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court.") (collecting cases); see also Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 169 (2d Cir. 2006) (deeming waived an issue raised for the first time in a reply brief).

[37]Also contentions by Nucor/SDI, USS, and AK Steel that the ITC failed to address every morsel of evidence presented are unavailing.  "The law is clear that the Commission does not have to explicitly address all information presented to it, only that it consider it."  Asociacción de Productores de Salmon y Trucha de Chile Ag v. U.S. Int'l Trade Comm'n, 26 CIT 29, 37, 108 F. Supp 2d 1360, 1370 (2002); see also Timkin U.S. Corp., 421 F.3d at 1354 (The ITC need not "make an explicit response to every argument made by a party, but [current law] instead requires that issues material to the agency's determination be discussed so that the 'path of the agency may reasonably be discerned' by a reviewing court.") (quoting SAA at 892).

[38]In determining the existence of substantial evidence, a reviewing court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" Huaiyin Foreign Trade Corp., 322 F.3d at 1374.

<u>Lines, Inc.</u>, 371 U.S. at 168.

For example, USS argues that improvements to the domestic industry cited by the ITC as proof of its healthy state are to be expected with the discipline of the orders in place.  (USS Br. at 50.)  However, USS's contention here misses the point.  The Commission found that, although the domestic industry benefitted from the orders, the domestic industry's improvements—restructuring and shedding legacy costs—indicated a more permanent change, <u>i.e.</u>, "a more efficient and cost effective industry," that would not be reversed absent the orders.  2007 Commission Views at 136 n.849 (C.R. 831).

Regarding arguments directed towards the operating margins, the ITC found that overall, the industry was healthy.  2007 Commission Views at 123, 136-39 (C.R. 831).  Moreover, the ITC pointed out that "[t]he industry's operating margin improved from negative or flat during the beginning of the review period to 10.8 percent in 2004 and remained positive at 4.9 percent in 2005 and 5.2 percent in interim 2006."  (ITC Resp. Br. at 61.)  Joint Plaintiff's assertion that the ITC ignored evidence showing the "eroding" advances made by the domestic industry post-restructuring in declining operating margins, is inconsequential.  First, the ITC is "presumed to have considered all of the evidence on the record" and "is not required to explicitly address every piece of evidence presented by the parties." <u>Nucor Corp.</u>, 28 CIT at 234, 318 F. Supp.2d at

1247 (citation omitted).  Next, having considered this evidence, as well as other

economic data, the ITC nevertheless concluded that the domestic industry was not

vulnerable.  2007 Commission Views at 136-39 (C.R. 831).  As a result, this Court will

not upset this determination at the urging of plaintiffs.  See Comm. for Fair Beam

Imports, 477 F. Supp.2d at 1326 ("[I]t is not the province of the Court to reweigh the

evidence before the agency.").

Considering all the arguments made by Nucor/SDI, USS , and AK Steel with

respect to Australia, France, Japan and Canada, this Court finds that plaintiffs/plaintiff-

intervenors have failed to demonstrate that the ITC's impact analysis and vulnerability

determination was not supported by substantial evidence or otherwise in accordance

with law.  Therefore, this Court affirms the ITC's impact analysis and vulnerability

determination applicable to Australia, France, Japan and Canada.

      2.    <u>Germany & Korea</u>

The ITC determined that the likely significant volumes of subject imports from

Germany and Korea would have a significant negative impact on the domestic industry

if the orders were revoked.  2007 Commission Views at 148 (C.R. 831).  The Commission

found that though the domestic CoRe steel market "is stronger and better able to handle

the vicissitudes" of the CoRe steel market, "it is not impervious to the effects of

significant quantities of aggressively priced import supplies. . . . The combined negative

effect on the industry as a whole would be significant." Id.

The ITC also incorporated its earlier domestic industry vulnerability finding and found it applicable to its determinations on Germany and Korea. Id. Notwithstanding its impact determination, the ITC found that the domestic industry was not vulnerable. Id.

      *a.*     *Contentions*

German Plaintiffs attack the ITC's likely impact determination as unreasonable due to the finding that the domestic industry was not vulnerable. (German Pl. Br. at 42-43 (citing Calabrian Corp. v. U.S. Int'l Trade Comm'n, 16 CIT 342, 354-355, 794 F. Supp 377, 388-389 (1992) ("[H]olding that there was substantial evidence for the Commission's negative preliminary injury determination in light of the fact that a robust industry is less likely to become materially injured in the near future.").)

      *b.*     *Analysis*

This Court finds German Plaintiffs' challenge unavailing. First, Calabrian Corp. is not binding on this Court nor applicable since it concerned an investigation rather than a sunset review. Second, this Court has held that a finding that the domestic industry is not currently vulnerable is not a dispositive determination and does not preclude the ITC from finding that the domestic industry would be negatively impacted upon the revocation of an order. See, e.g., Nevinnomysskiy Azot v. United States, 31

CIT __, __, 2007 WL 2563571, at *16 n.22 (2007) (finding that where the domestic

industry is not currently vulnerable "does not preclude an affirmative determination").

    In accordance with 19 U.S.C. § 1675a(a)(1)(c), the ITC properly considered the

condition of the domestic industry in its impact analysis.  See 2007 Commission Views

at 145-46 (P.R. 940).  Accordingly, this Court rejects the challenges by German Plaintiffs,

and holds that the ITC's likely impact and vulnerability determinations were reasonable

exercises of its discretion, supported by substantial evidence and are otherwise in

accordance with law.

    **E.    The ITC Was Not Required to Apply a Bratsk Analysis**

    This Court now turns to one final issue: the propriety of an analysis pursuant to

Bratsk Aluminum Smelter in the ITC's sunset review.  See Bratsk Aluminum Smelter v.

United States, 444 F.3d 1369, 1373 (Fed. Cir. 2006).

        1.    Contentions

            a.    *German Plaintiffs*

    German Plaintiffs contend that the ITC's impact determination was unreasonable

because the Commission failed to consider the potential adverse impact of non-subject

imports on the CoRe steel market—an analysis that the CAFC required by way of its

decision in Bratsk Aluminum Smelter, 444 F.3d at 1373. (German Pl. Br. at 43-46.)

Moreover, counsel for German Plaintiffs argue that this Court should follow the recent

decision of this court holding that a <u>Bratsk</u> analysis must be considered as part of a

sunset review when certain triggering factors are met.  Oral Argument, Nov. 5, 2008; <u>see</u>

<u>NSK Corp. v. United States</u>, 32 CIT __, __, 577 F. Supp. 2d 1322 (2008) (Barzilay, J.).

German Plaintiffs argue that the CAFC requires the Commission to

"[u]ndertake additional vulnerability and causation analysis [sic] involving imports not

subject to the order in issue when they (1) consist of commodity products and (2) are

price competitive, having a significant presence in the U.S. market."  (German Pl.'s Br.

at 43 (footnote omitted).)  German Plaintiffs argue that these numerated elements are

present in this case, variously referring them as "triggering factor[s]," "component[s],"

and "prong[s]."[39]  (<u>Id.</u> at 43-45.)  Consequently, they argue that <u>Bratsk</u> requires the ITC

to conduct a "replacement/benefit test," <u>i.e.</u>, determine whether non-subject imports,

sold at lower prices, even if fairly traded, would replace subject imports when an

antidumping duty order is in place.  (<u>Id.</u> at 42-44 (<u>citing</u> <u>Bratsk</u>, 444 F.3d at 1373, 1374-

75).)

German Plaintiffs concede that the <u>Bratsk</u> case itself involved a material injury

investigation, which involves a different type of procedure than the sunset review in

---

[39]In using these various terms German Plaintiffs cite to the portion of the <u>Bratsk</u>
opinion that sets forth the conditions precedent for the <u>Bratsk</u> analysis.  <u>See</u>, <u>e.g.</u>, <u>Bratsk</u>,
444 F.3d at 1373, 1375.  While this Court does not adopt the German Plaintiffs'
characterization of these conditions precedent, this Court will hereinafter adopt the
term "triggering factors" to describe these conditions precedent.  For a more thorough
explanation of the triggering factors, <u>see</u> <u>infra</u> section II.E.2 of this opinion.

this case.  Nevertheless, German Plaintiffs advocate for application of a <u>Bratsk</u> analysis,

reasoning that the same issues "concerning the effect of subject imports versus non-

subject imports applies in sunset reviews."  (German Pl.'s Br. at 44.)  Sunset reviews,

they argue, require a causation analysis, much like injury investigations.  (<u>Id.</u>)  This

causation analysis must determine "whether revocation of an order 'would be likely to

lead to continuation or recurrence of material injury' albeit within a prospective,

counterfactual context."  (<u>Id.</u> (<u>citing</u> 19 U.S.C. § 1675a(a)(1)) (emphasis omitted))  The

German Plaintiffs stress that extending <u>Bratsk</u> would mean that the ITC may issue an

affirmative determination in a sunset review only when the evidence shows that the

subject imports—and not other non-subject imports—are likely to adversely affect the

domestic industry in the reasonably foreseeable future.  (<u>Id.</u>)

German Plaintiffs contend that all of the <u>Bratsk</u> triggering factors are present in

this sunset review.  When the ITC decided to cumulate German and Korean subject

imports, they argue, that determination swept up "commodity grades" of CoRe steel,

which triggered the first <u>Bratsk</u> factor.  (<u>Id.</u>)  German Plaintiffs also argue that the

second <u>Bratsk</u> factor was implicated by the ITC's concession that price-competitive

CoRe steel non-subject imports had a significant presence in the U.S.  (<u>See id.</u> at 45

(<u>citing</u> 2007 Commission Views at 126 (C.R. 831)).)  Having met the qualifying <u>Bratsk</u>

factors, German Plaintiffs argue, the ITC should have recognized the significance of

record evidence indicating that the volume of non-subject CoRe steel during the POR

exceeded the volume of subject CoRe steel imports.  (Id.)  Consequently, German

Plaintiffs claim that the ITC erred due to its failure to account for the "substantial effect

of non-subject imports" in its conclusions on Germany and Korea.  (Id. at 46 (citing

Nevinnomysskiy, 31 CIT at __, 2007 WL 2563571, at *14-15 (remand ordered in a sunset

review where Commission failed to explain why subject imports would depress certain

commodity prices when the non-subject imports had not done so)).)

> b.    *ITC, Def.-Intervs. ArceleorMittal USA, Nucor, SDI, & USS*

   The ITC, Arcelor Mittal, Nucor, SDI, and USS all respond in opposition primarily

arguing that the ITC is not required to apply a Bratsk replacement/benefit test in a

sunset review because such analysis only applies to injury investigations and is not

required by Bratsk.  (ITC Resp. Br. at 75-76; Def.-Interv. ArceleorMittal Resp. Br. 38;

Def.-Interv. USS Resp. Br. 36–37; Nucor/SDI Resp. Br. 39-41.)

> 2.    What is required by Bratsk in light of Mittal Steel?

   The CAFC recently clarified the meaning of Bratsk in Mittal Steel Point Lisas Ltd.

v. United States, 542 F.3d 867 (Fed. Cir. 2008).  Read together, Bratsk and Mittal Steel

explain how the ITC is to make its causation determination in final phase investigations

of certain antidumping cases.

   The Commission's statutory requirement during a final phase investigation

includes an obligation to:

> make a final determination of whether—(A) an industry in the
> United States—(i) is materially injured, or (ii) is threatened
> with material injury . . . by reason of [dumped] imports.

19 U.S.C. § 1673d(b)(1) (2000).  The CAFC has stated that <u>Bratsk</u> clarifies the ITC's

statutory duty to determine whether injury to the domestic industry has occurred "by

reason of" subject imports, in cases where certain triggering factors exist.  <u>Mittal Steel</u>,

542 F.3d at 876.  In such cases, the Commission must consider whether the subject

imports are the "but for" cause of injury to the domestic industry.  <u>Id.</u>  The triggering

factors are present "where commodity products are at issue and fairly traded, price

competitive, non-subject imports are in the market."  <u>Id.</u> at 878 (quoting <u>Bratsk</u>, 444 F.3d

at 1369).  In establishing this rule, the CAFC was concerned that the Commission might

incorrectly attribute the domestic producers' injury to the subject imports where in fact

the injury is actually the result of highly similar non-subject imports.  This is likely to

happen when there are substantial quantities of competitively-priced, interchangeable,

non-subject imports present in the domestic market.  <u>Id.</u> at 878.  The analytical

framework of <u>Bratsk/Mittal Steel</u> is designed to hedge against such misallocation.

By way of background, in <u>Gerald Metals, Inc. v. United States</u>, 132 F.3d 720 (Fed.

Cir. 1997), the predecessor case to <u>Bratsk</u>,[40] the CAFC found that the Commission had

---

[40]In <u>Gerald Metals</u>, the CAFC reversed an affirmative injury determination of the
Commission on the grounds that insufficient attention had been given to the role of

made exactly this error in its final phase investigation—failing to appropriately consider

the role of non-subject imports before issuing an affirmative injury determination.  The

CAFC there concluded that, not only was there an abundance of non-subject imports in

the market, but the subject imports and non-subject (fairly traded) imports "were

perfect substitutes for each other, if not the exact same product."  Gerald Metals, 132

F.3d at 720.  Moreover, these non-subject imports "undersold the domestic product

almost as frequently as did LTFV imports."  Id. at 718.  Under these circumstances, the

CAFC held that the ITC had failed to consider an important aspect of the causation

question, in that the Commission failed to even **mention** the fairly-traded non-subject

imports in its injury analysis.[41]  Id. at 723.  On remand, the Commission reconsidered its

non-subject imports in the injury analysis.  Gerald Metals, Inc., 132 F.3d at 723.

[41]The products at issue in Gerald Metals were pure and alloy magnesium from
China, Russia and Ukraine.  In the portion of the Commission's analysis dedicated to
determining whether there had been material injury by reason of dumped imports, no
reference was made to non-subject imports.  See Magnesium from China, Russia and
Ukraine, U.S. Int'l Trade Comm'n Pub. 2885, Inv. Nos. 731-TA-696-698 at 18-22 (May
1995) (Final).  The Commission's failure in this regard is underscored by the fact that all
three of the dissenting Commissioners in the case cited the significant role of fairly
traded non-subject imports as a key reason for their negative votes.  Id. at 29 (Chairman
Watson, dissenting) ("[f]air value imports were significant in volume relative to LTFV
imports and . . . the market presence of fair value imports of pure magnesium exceeded
that of LTFV imports.); Id. at 35 (Vice Chairman Nuzum, dissenting) ("[fairly traded]
imports undersold the domestic product almost as frequently as did LTFV imports.");
Id. at 45 (Comm'r Crawford, dissenting) ("There is no evidence on the record to indicate
any product differentiation, non-price differences or differences in terms and conditions
of sale between dumped Russian imports and fairly traded Russian imports.
Consequently, I conclude that dumped Russian imports and fairly traded Russian

decision in light of the instructions to consider directly the role of non-subject imports

in injuring the domestic industry, and in so doing reached a negative injury

determination, which was sustained by the CIT.  See Gerald Metals, Inc. v. United

States, 22 CIT 1009, 27 F. Supp.2d 1351 (1998) (remand determination).

     In Bratsk, the CAFC extended the requirement of Gerald Metals.  This case also

involved a large number of price-competitive, interchangeable non-subject imports.

Bratsk, 444 F.3d at 1371.  In its injury analysis here, however, the Commission had given

**direct consideration** to the role those non-subject imports played in injuring the

domestic industry.  While the ITC decided non-subject imports may have injured the

domestic industry, it nevertheless concluded that the dumped merchandise had made

its own "material adverse impact on the domestic industry," and proceeded to issue an

affirmative injury determination.  Silicon Metal from Russia, U.S. Int'l Trade Comm'n

Pub. 3584, Inv. No. 731-TA-991 at 19 (March 2003) (Final); see also Bratsk, 444 F.3d at

1372.  When the CAFC decided Bratsk, it found, as it had in Gerald Metals, that the ITC

still had not adequately considered the role of non-subject imports in causing injury.

Bratsk, 444 F.3d at 1372, 1375.

     Mittal Steel has now clarified[42] that Bratsk explains how the ITC can satisfy the

_____

imports are very close, if not perfect, substitutes for each other.").

     [42]The initial holding in Bratsk was difficult to discern.  The CAFC acknowledged
this in Mittal Steel even as it reversed the Commission's erroneous interpretation of

requirement to consider the impact of non-subject imports in those situations where these triggering factors exist.[43]  It does so by explaining what the Commission must do before it issues an affirmative injury determination in such cases.  Namely, in order to find that **subject imports** are the cause of injury to the domestic industry, the ITC must first conclude that they are the "but for" cause of that injury.  Mittal Steel, 542 F.3d at 876.  According to Mittal Steel, once the ITC determines that subject imports are the "but for" cause of injury to the domestic industry, it may be confident that it has not committed the same error that was litigated in Gerald Metals and Bratsk—i.e., failing to sufficiently consider the role of abundant, interchangeable, price-competitive non-subject imports in causing injury to the domestic industry.

Mittal Steel also spells out how the Commission is to complete the "but for"[44]

_____

Bratsk.  Said the CAFC, "the error we have found flows largely from the Commission's effort to proceed with scrupulous attention to the terms of this court's remand instructions.  The problem may stem from a lack of sufficient clarity in our prior opinion, which we hope has been rectified in this one."  Mittal Steel, 542 F.3d at 879.

[43]Mittal Steel also makes clear that the Commission's interpretation of Bratsk as requiring a "replacement/benefit test" was fundamentally flawed and not required.  Mittal Steel, 542 F.3d at 876-78.

[44]Mittal Steel appears to be the first time that a reference to "but for" causation, a legal principle well known in tort law, has made its way into a case involving the ITC's causation determination in an antidumping proceeding.  Previously, this causation determination was referred to in the antidumping context as a "one-step analysis."  Mittal Steel defines "but for" causation by quoting the U.S. Supreme Court decision in Price Waterhouse v. Hopkins, 490 U.S. 228, 240 (1989):

causation analysis—by asking "whether non-subject or non-LTFV imports would have

replaced LTFV subject imports during the period of investigation without a continuing

benefit to the domestic industry."[45]  Id. at 878.  If the ITC finds that the domestic

industry would **not** have been better off in the absence of the dumped goods, this

would weigh **against** a finding that the domestic industry's injury is "by reason of" the

LTFV goods.  See Bratsk, 444 F.3d at 1373; Mittal Steel, 542 F.3d at 876.  Mittal Steel

acknowledges that such a determination is "not necessarily dispositive" on the overall

issue of causation under the antidumping laws, but is an indispensable component of

----

> In determining whether a particular factor was a but for cause
> of a particular event, we begin by assuming that that factor
> was present at the time of the event, and then ask whether
> even if that factor had been absent, the event nevertheless
> would have transpired in the same way.

Mittal Steel, 542 F.3d at 876.  The one-step analysis was previously defined in nearly
identical language by the CIT in Gerald Metals, Inc. v. United States, 20 CIT 1065, 1068
n.16, 937 F. Supp. 930, 934 n.16 (1996), rev'd on other grounds, 132 F.3d 716 (Fed. Cir.
1997):

> [T]he one-step analysis . . . recreates what the industry would
> look like in the absence of the LTFV imports, and then
> compares that situation to the domestic industry as it exists.
> This analysis isolates the effects of the subject imports from
> other factors which might be causing injury to the domestic
> industry.

[45]The CAFC here is invoking language from its previous opinion in Bratsk.  See
Brtatsk, 444 F.3d at 1376 ("[T]he Commission [must] specifically address whether the
non-subject imports would have replaced subject imports during the period of
investigation.").  See generally supra n.42.

the causation analysis when the triggering factors are met.  Mittal Steel, 542 F.3d at 876.

The Court now turns to the implications of Bratsk/Mittal Steel in this case.

3.       Analysis

a.       *When is the* Bratsk *analysis required?*

The Bratsk ruling was issued in a case reviewing the ITC's final phase

investigation in an antidumping case.  Bratsk, 444 F.3d at 1371-72.  Consequently, on its

face, the ruling does not speak to the applicability of the analysis to any other type of

Commission decision, such as preliminary phase investigations or five-year review

(sunset) investigations.  The specific question raised by the German Plaintiffs in this

case is whether this Court should extend the requirements of Bratsk to include sunset

reviews where the triggering factors are present.  (German Pl.'s Br. at 43-46; German

Pl's Reply Br. at 20-24.)  The answer is no.  While there were some ambiguities in the

Bratsk opinion that arguably suggested a far-reaching analysis, the CAFC in Mittal

Steel, clearly narrowed its holding; Bratsk is a mere complement to the statute

governing final phase investigations.[46]  See 19 U.S.C. § 1673d(b)(1); Mittal Steel, 542 F.3d

at 878-79.

---

[46]Because Bratsk does not apply in sunset reviews, this Court need not decide
whether the triggering factors are present in this case.  Moreover, any determination
regarding the existence of the triggering factors in a given case lies squarely within the
purview of the Commission.  See Mittal Steel, 542 F.3d. at 875 ("The Commission, and
not this court, is the finder of facts in antidumping investigations, and it is up to the
Commission to make findings of fact on issues such as fungibility.").

The Bratsk/Mittal Steel analysis is designed to augment the Commission's determination in a final phase investigation. In a final phase investigation, the Commission is required to:

> make a final determination of whether—(A) an industry in the United States—(i) is materially injured, or (ii) is threatened with material injury . . . by reason of [dumped] imports.

19 U.S.C. § 1673d(b)(1) (2000). Referring to this statutory command, the CAFC determined that a "but for" causation analysis is "a proper part of the Commission's responsibility to determine whether the injury to the domestic industry is 'by reason of' the subject imports." Mittal Steel, 542 F.3d at 877 (quoting 19 U.S.C. § 1673d(b)(1)). In other words, Mittal Steel explicitly links the Bratsk analysis with the final phase investigation statute, supporting a strong inference that the final phase investigation is the only context in which the Bratsk/Mittal Steel analysis should be applied.[47]

---

[47]This is not the first time that this court has addressed the issue of whether or not to extend the Bratsk analysis to sunset reviews. NSK Corp. v. United States, 32 CIT __, __, 577 F. Supp. 2d 1322, 1333 (2008) (Barzilay, J.) (holding that when the triggering factors are present the ITC should conduct a Bratsk analysis during sunset reviews); cf. Nevinnomysskiy, 31 CIT at __, 2007 WL 2563571 at *14-15 (using Bratsk in likely price effects analysis under 19 U.S.C. § 1675a(a)(3) (2000)).

NSK found that the language of the sunset review statute, 19 U.S.C. §1675a(a)(1), incorporated "an implied element of causation." NSK, 577 F. Supp.2d at 1332. Given that the Federal Circuit required the ITC to conduct the Bratsk analysis in its causation inquiry in the context of an investigation, the court in NSK held that since it found a causation analysis implicit in the sunset review, it was therefore logical to extend Bratsk to sunset reviews when the triggering factors are present. NSK went on to state that the

[a]pplication of Bratsk [in a sunset review] . . . would compel

> *b. The* Bratsk/Mittal Steel *analysis is inapplicable to sunset reviews because of fundamental differences between sunset reviews and final phase investigations.*

In order to complete a Bratsk/Mittal Steel analysis in a final phase dumping investigation, the Commission must have certain information at its disposal: specifically, data regarding the volume and price of subject and non-subject imports that were present in the market during the period of investigation, and data regarding the injury suffered by the domestic industry.  See id. at 873-74.  Once this information from the period of investigation is made part of the administrative record, it is readily available for the Commission to use in its injury analysis during a final phase

---

> the ITC to address significant increases in market share by non-subject imports and thereby examine the effectiveness of the underlying antidumping order in relation to fundamental changes in the marketplace that might be more likely to cause injury to the domestic industry than unrestrained subject imports.

Id. at 1332-33 (emphasis added).  The NSK court reasoned that this extension of the law was necessary, because "[t]o hold otherwise would permit the ITC to ignore a significant factor affecting the domestic industry when conducting a sunset review."  Id. at 1333.

Whenever this Court considers the holding and reasoning of a previous opinion rendered by a different Judge of the CIT, it regards such opinions as persuasive, of course, but not binding precedent.  See, e.g., D&L Supply Co. v. United States, 22 CIT 539, 540 (1998).  Moreover, intervening changes in governing law necessarily affect the persuasive authority of previous decisions of the CIT.  See Id. at 540-41 (citing a change in the statutory scheme as reason for departing from another opinion of the CIT).  Any language within the text of Bratsk arguably implying it should have been extended to sunset reviews now seems foreclosed in light of the holding and reasoning of Mittal Steel.

investigation.  Without such information, it would be impossible to complete the "but

for" causation analysis as it is envisioned by Bratsk/Mittal Steel.  Id. at 876.  The

presence of this information in a final phase investigation represents a stark contrast

with the scenario encountered by the Commission during a sunset review.

      In a sunset review, the Commission is required to determine,

> whether revocation of the . . . antidumping duty order . . .
> would be likely to lead to continuation or recurrence of
> dumping . . . and of material injury.

19 U.S.C. § 1675(c)(1) (2000); see also, 19 U.S.C. § 1675a(a)(1) (2000).  Here, the

Commission is concerned with the consequences of revoking an antidumping duty

order in the reasonably foreseeable future, and not with whether the subject imports

were the "but for" cause of injury already suffered by the domestic industry.  If the

Commission was required to apply the Bratsk analysis in a sunset review, it would

necessarily have to do so counter-factually,[48] i.e., without any data on the price, volume,

and effect of subject and non-subject imports that would possibly re-enter the market

upon revocation of the antidumping duty order.  Attempting to complete a Bratsk

analysis under such conditions would be predicated upon conjecture and speculation.

It would therefore be untenable.

      Moreover, Mittal Steel unambiguously held that in a Bratsk analysis, "[t]he focus

---

[48]See SAA at 883-84, 1994 U.S.C.C.A.N. at 4209 (describing the sunset review
analysis as "counter-factual").

of the inquiry is on the cause of injury in the **past** . . . ."  Mittal Steel, 542 F.3d at 876

(emphasis added).  In other words, in keeping faith with 19 U.S.C. § 1673d(b), the

Bratsk/Mittal Steel analysis requires a strictly **retrospective** assessment of what has

happened during the period of investigation, prior to the imposition of an antidumping

order.  This Court concludes that this retrospective language is not incidental—i.e., a

mere coincidence of the fact that both Bratsk and Mittal Steel were brought in the

context of final phase investigations—but rather is essential to the character of the "but

for" analysis that this line of cases requires.  See discussion supra Part II.E.2.

Even if there is, arguably, an implied element of causation in a sunset review

determination (see supra n.39), and even if, arguably, the Commission could overcome

the void of information with which to conduct a "but for" analysis in a sunset review,

nothing in the sunset review statute suggests that a Bratsk type review is required.  See

19 U.S.C. § 1675(c)(1) (2000); see also 19 U.S.C. § 1675a(a)(1) (2000).  The Bratsk type

analysis has no role in the **prospective** (i.e., "counter-factual") determination of the

sunset review.  Accordingly, in light of the foregoing analysis, this Court holds that the

extension of the Bratsk type analysis to sunset reviews, as German Plaintiffs advocate, is

not appropriate.  This Court further holds that a Bratsk type analysis was not required

in this sunset review, and holds that the ITC's determination was reasonable, supported

by substantial evidence on the record, and was otherwise in accordance with law.  See

19 U.S.C. § 1516a(b)(1)(B)(i) (2000).

> *c.  The Commission is not, by virtue of this holding, entitled to ignore the role of non-subject imports during a sunset review if such imports are "relevant economic factors."*

This Court declines to extend the requirements of a <u>Bratsk</u> type analysis to sunset reviews, because the specific analysis required by <u>Bratsk</u> is limited to its stated purpose and scope—that is, to help ensure that the ITC has not overlooked injurious non-subject imports when reaching an affirmative injury determination in a final phase investigation.  Nevertheless, this holding should not be read to provide the Commission license to unilaterally disregard data related to non-subject imports during a sunset review,[49] if it finds that such imports are a "relevant economic factor[]" to its determination.  <u>See</u> 19 U.S.C. §§ 1675a(a)(2), (4) (2000).  For instance, the Commission may be presented with data on non-subject imports that entered the market at some point prior to the sunset review, whether during the period of review, while the discipline of the order was in place, or during the period of investigation, before the order was imposed.  To the extent that such data is a "relevant economic factor" to the ITC's sunset review determination, it may not be ignored.  <u>Id.</u>

This requirement to consider relevant economic factors is an essential portion of

---

[49]In defending why it was extending <u>Bratsk</u> to sunset reviews, <u>NSK</u> stated that "[t]o hold otherwise would permit the ITC to ignore a significant factor affecting the domestic industry when conducting a sunset review."  <u>NSK,</u> at *5.

the sunset review statute.  When "evaluating the likely volume of imports of the subject

merchandise if the order is revoked," the statute provides that "the Commission shall

consider **all relevant economic factors.**"  19 U.S.C. § 1675a(a)(2) (2000) (emphasis

added).  Similarly, "in evaluating the likely impact of imports of the subject

merchandise on the industry . . . the Commission shall consider **all relevant economic**

**factors** which are likely to have a bearing on the state of the industry in the United

States."  19 U.S.C. § 1675a(a)(4) (2000) (emphasis added).  In light of these statutory

requirements, this Court does not expect that its holding will permit the ITC to ignore

any significant factors during a sunset review.[50]  To be sure, it would be an abuse of

discretion for the ITC to ignore such important factors if they were relevant.  See Motor

Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983); Timkin U.S.

Corp. v. United States, 421 F.3d 1350, 1355-56 (Fed. Cir. 2005).

---

[50]In support of this expectation, the Court notes that the Commission has, from
time to time, done exactly this—taken available data regarding non-subject imports into
account in the process of completing a sunset review.  See, e.g., Sorbitol from France,
U.S. Int'l Trade Comm'n Pub. 3706, Inv. No. 731-TA-44 at 23-24 (July 2004) (Review)
(finding that "[b]ecause the domestic market is dominated by U.S. and nonsubject
suppliers . . . revocation of the antidumping order is not likely to lead to significant
increase in the volume of subject imports.").

## CONCLUSION

In accordance with the foregoing, the Court affirms the ITC's <u>Final Sunset</u>

<u>Determination</u>.  Plaintiffs', Plaintiff-Intervenors', and Consolidated Plaintiffs' motions,

pursuant to U.S. CIT R. 56.2, are hereby DENIED.  This consolidated action is dismissed

and a separate judgment of the Court will issue dismissing this consolidated action and

sustaining the Sunset Reviews below.

**SO ORDERED.**

      /s/ Gregory W. Carman
Gregory W. Carman, Judge

Dated:        December 23, 2008
              New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

---

NUCOR CORPORATION and STEEL DYNAMICS, INC.,

                           Plaintiffs,

      and

THYSSENKRUPP STEEL AG, THYSSENKRUPP STEEL N.A., INC. and SALZGITTER AG STAHL UND TECHNOLOGIE,

                      Consolidated Plaintiffs,

      and

AK STEEL CORPORATION and UNITED STATES STEEL CORPORATION,

                    Plaintiff-Intervenors,

      v.

UNITED STATES,

                        Defendants,

      and

JFE STEEL CORP., KOBE STEEL, LTD., NIPPON STEEL CORP., NISSHIN STEEL CO., LTD., SUMITOMO METAL INDUS., LTD., BLUESCOPE STEEL AMERICAS LLC, BLUESCOPE STEEL LTD., ARCELORMITTAL USA INC., and ARCELORMITTAL DOFASCO INC.,

                  Defendant-Intervenors.

**BEFORE: GREGORY W. CARMAN, JUDGE**

Consol. Court No. 07-00071

---

## JUDGMENT

This case having been duly submitted for decision, and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** plaintiffs', plaintiff-intervenors' and consolidated plaintiffs' motions

*Court No. 07-71*                                                            *Page 2*

pursuant to USCIT R. 56.2 are denied; and it is further

**ORDERED** that the final determination of the United States International Trade
Commission in the five-year "sunset" reviews concerning corrosion resistant ("CoRe")
steel products, entitled <u>Certain Carbon Steel Products From Australia, Belgium, Brazil,
Canada, Finland, France, Germany, Japan, Korea, Mexico, Poland, Romania, Spain,
Sweden, Taiwan, and the United Kingdom</u>, Inv. Nos. AA1921-197 (2d Review); 701-TA-
319, 320, 325-327, 348, and 350 (2d Review); and 731-TA-573, 574, 576, 578, 582-587, 612,
and 614-618 (2d Review), USITC Pub. No. 3899 (January 2007), is affirmed; and it is
further

**ORDERED** that this case is dismissed.


                                          /s/ Gregory W. Carman
                                          Gregory W. Carman, Judge


Dated:        December 23, 2008
              New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                          Deputy Clerk